# C & A CARBONE, INC., ET AL. *v.* TOWN OF CLARKSTOWN, NEW YORK

No. 92–1402.   Argued December 7, 1993—Decided May 16, 1994

KENNEDY, J., delivered the opinion of the Court, in which STEVENS, SCALIA, THOMAS, and GINSBURG, JJ., joined. O'CONNOR, J., filed an opinion concurring in the judgment, *post*, p. 401. SOUTER, J., filed a dissenting opinion, in which REHNQUIST, C. J., and BLACKMUN, J., joined, *post*, p. 410.

*Betty Jo Christian* argued the cause for petitioners. With her on the briefs were *Paul J. Ondrasik, Jr., David Silverman, Kenneth Resnik,* and *Charles G. Cole.*

*William C. Brashares* argued the cause for respondent. With him on the brief were *Murray N. Jacobson* and *Richard A. Glickel.*\*

---

\*Briefs of *amici curiae* urging reversal were filed for Incorporated Villages of Westbury, Mineola, and New Hyde Park et al. by *Lawrence W. Boes, Jerome F. Matedero, John M. Spellman,* and *Donna M. C. Giliberto;*

JUSTICE KENNEDY delivered the opinion of the Court.

As solid waste output continues apace and landfill capacity becomes more costly and scarce, state and local governments

for the Chemical Manufacturers Association et al. by *Theodore L. Garrett;* and for the National Solid Wastes Management Association by *Bruce L. Thall* and *Bruce J. Parker.*

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey by *Robert J. Del Tufo,* Attorney General, *Mary C. Jacobson,* Assistant Attorney General, and *Carla Vivian Bello,* Senior Deputy Attorney General; for the State of Ohio et al. by *Lee Fisher,* Attorney General, and *Susan E. Ashbrook* and *Bryan F. Zima,* Assistant Attorneys General; and by the Attorneys General and other officials for their respective jurisdictions as follows: *Charles E. Cole,* Attorney General of Alaska, *Grant Woods,* Attorney General of Arizona, *Richard Blumenthal,* Attorney General of Connecticut, *Charles M. Oberly III,* Attorney General of Delaware, *Robert A. Butterworth,* Attorney General of Florida, *Robert A. Marks,* Attorney General of Hawaii, *Roland W. Burris,* Attorney General of Illinois, *Pamela Carter,* Attorney General of Indiana, *Bonnie J. Campbell,* Attorney General of Iowa, *Michael E. Carpenter,* Attorney General of Maine, *Scott Harshbarger,* Attorney General of Massachusetts, *Frank J. Kelley,* Attorney General of Michigan, *Hubert H. Humphrey III,* Attorney General of Minnesota, and *Beverly Connerton* and *Stephen Shakman,* Assistant Attorneys General, *Joseph P. Mazurek,* Attorney General of Montana, *Michael F. Easley,* Attorney General of North Carolina, *Theodore R. Kulongoski,* Attorney General of Oregon, *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, *Pedro R. Pierluisi,* Attorney General of Puerto Rico, *T. Travis Medlock,* Attorney General of South Carolina, *Stephen D. Rosenthal,* Attorney General of Virginia, and *James E. Doyle,* Attorney General of Wisconsin; for the State of New York et al. by *Robert Abrams,* Attorney General, *Jerry Boone,* Solicitor General, *Andrea Green,* Deputy Solicitor General, *John J. Sipos* and *Gordon J. Johnson,* Assistant Attorneys General, *O. Peter Sherwood, Leonard J. Koerner,* and *Martin Gold;* for Prince George's County, Maryland, et al. by *Lewis A. Noonberg, Charles W. Thompson, Jr.,* and *Michael P. Whalen;* for Rockland County, New York, by *Ilan S. Schoenberger,* for the County of San Diego, California, by *Lloyd M. Harmon, Jr., Diane Bardsley, Scott H. Peters, W. Cullen MacDonald, Eric S. Petersen,* and *Jerome A. Barron;* for the City of Indianapolis, Indiana, et al. by *Scott M. DuBoff, Pamela K. Akin, Felshaw King, Mary Anne Wood, Michael F. X. Gillin, John D. Pirich, David P. Bobzien, Robert C. Cannon,* and *Patrick T. Boulden;* for the City of Springfield, Missouri, by *Stuart H. Newberger, Jeffrey H. How-*

are expending significant resources to develop trash control systems that are efficient, lawful, and protective of the environment. The difficulty of their task is evident from the number of recent cases that we have heard involving waste transfer and treatment. See *Philadelphia* v. *New Jersey*, 437 U. S. 617 (1978); *Chemical Waste Management, Inc.* v. *Hunt*, 504 U. S. 334 (1992); *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources*, 504 U. S. 353 (1992); *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore., ante,* p. 93. The case decided today, while perhaps a small new chapter in that course of decisions, rests nevertheless upon well-settled principles of our Commerce Clause jurisprudence.

We consider a so-called flow control ordinance, which requires all solid waste to be processed at a designated transfer station before leaving the municipality. The avowed purpose of the ordinance is to retain the processing fees charged at the transfer station to amortize the cost of the facility. Because it attains this goal by depriving competitors, including out-of-state firms, of access to a local market, we hold that the flow control ordinance violates the Commerce Clause.

The town of Clarkstown, New York, lies in the lower Hudson River Valley, just upstream from the Tappan Zee Bridge and by highway minutes from New Jersey. Within the town limits are the village of Nyack and the hamlet of West Nyack. In August 1989, Clarkstown entered into a consent

*ard,* and *Clifton S. Elgarten;* for the Town of Smithtown, New York, et al. by *W. Cullen MacDonald, Richard L. Sigal, Eric S. Petersen,* and *Jon A. Gerber;* for the Solid Waste Disposal Authority of the city of Huntsville, Alabama, by *Charles H. Younger;* for the Clarendon Foundation by *Ronald D. Maines;* for the National Association of Bond Lawyers by *C. Baird Brown, Robert B. McKinstry, Jr.,* and *Brendan K. Collins;* for the National Association of Counties et al. by *Richard Ruda;* for Ogden Projects, Inc., by *Robert C. Bernius* and *Jeffrey R. Horowitz;* and for the Solid Waste Association of North America et al. by *Barry S. Shanoff, B. Richard Marsh,* and *Robert D. Thorington.*

decree with the New York State Department of Environmental Conservation. The town agreed to close its landfill located on Route 303 in West Nyack and build a new solid waste transfer station on the same site. The station would receive bulk solid waste and separate recyclable from nonrecyclable items. Recyclable waste would be baled for shipment to a recycling facility; nonrecyclable waste, to a suitable landfill or incinerator.

The cost of building the transfer station was estimated at $1.4 million. A local private contractor agreed to construct the facility and operate it for five years, after which the town would buy it for $1. During those five years, the town guaranteed a minimum waste flow of 120,000 tons per year, for which the contractor could charge the hauler a so-called tipping fee of $81 per ton. If the station received less than 120,000 tons in a year, the town promised to make up the tipping fee deficit. The object of this arrangement was to amortize the cost of the transfer station: The town would finance its new facility with the income generated by the tipping fees.

The problem, of course, was how to meet the yearly guarantee. This difficulty was compounded by the fact that the tipping fee of $81 per ton exceeded the disposal cost of unsorted solid waste on the private market. The solution the town adopted was the flow control ordinance here in question, Local Laws 1990, No. 9 of the Town of Clarkstown (full text in Appendix). The ordinance requires all nonhazardous solid waste within the town to be deposited at the Route 303 transfer station. *Id.*, § 3.C (waste generated within the town), § 5.A (waste generated outside and brought in). Noncompliance is punishable by as much as a $1,000 fine and up to 15 days in jail. § 7.

The petitioners in this case are C & A Carbone, Inc., a company engaged in the processing of solid waste, and various related companies or persons, all of whom we designate Carbone. Carbone operates a recycling center in Clarks-

town, where it receives bulk solid waste, sorts and bales it, and then ships it to other processing facilities—much as occurs at the town's new transfer station. While the flow control ordinance permits recyclers like Carbone to continue receiving solid waste, § 3.C, it requires them to bring the nonrecyclable residue from that waste to the Route 303 station. It thus forbids Carbone to ship the nonrecyclable waste itself, and it requires Carbone to pay a tipping fee on trash that Carbone has already sorted.

In March 1991, a tractor-trailer containing 23 bales of solid waste struck an overpass on the Palisades Interstate Parkway. When the police investigated the accident, they discovered the truck was carrying household waste from Carbone's Clarkstown plant to an Indiana landfill. The Clarkstown police put Carbone's plant under surveillance and in the next few days seized six more tractor-trailers leaving the facility. The trucks also contained nonrecyclable waste, originating both within and without the town, and destined for disposal sites in Illinois, Indiana, West Virginia, and Florida.

The town of Clarkstown sued Carbone in New York Supreme Court, Rockland County, seeking an injunction requiring Carbone to ship all nonrecyclable waste to the Route 303 transfer station. Carbone responded by suing in United States District Court to enjoin the flow control ordinance. On July 11, the federal court granted Carbone's injunction, finding a sufficient likelihood that the ordinance violated the Commerce Clause of the United States Constitution. *C. & A. Carbone, Inc.* v. *Clarkstown,* 770 F. Supp. 848 (SDNY 1991).

Four days later, the New York court granted summary judgment to respondent. The court declared the flow control ordinance constitutional and enjoined Carbone to comply with it. The federal court then dissolved its injunction.

The Appellate Division affirmed. 182 App. Div. 2d 213, 587 N. Y. S. 2d 681 (2d Dept. 1992). The court found that the

ordinance did not discriminate against interstate commerce because it "applies evenhandedly to all solid waste processed within the Town, regardless of point of origin." *Id.*, at 222, 587 N. Y. S. 2d, at 686. The New York Court of Appeals denied Carbone's motion for leave to appeal. 80 N. Y. 2d 760, 605 N. E. 2d 874 (1992). We granted certiorari, 508 U. S. 938 (1993), and now reverse.

At the outset we confirm that the flow control ordinance does regulate interstate commerce, despite the town's position to the contrary. The town says that its ordinance reaches only waste within its jurisdiction and is in practical effect a quarantine: It prevents garbage from entering the stream of interstate commerce until it is made safe. This reasoning is premised, however, on an outdated and mistaken concept of what constitutes interstate commerce.

While the immediate effect of the ordinance is to direct local transport of solid waste to a designated site within the local jurisdiction, its economic effects are interstate in reach. The Carbone facility in Clarkstown receives and processes waste from places other than Clarkstown, including from out of State. By requiring Carbone to send the nonrecyclable portion of this waste to the Route 303 transfer station at an additional cost, the flow control ordinance drives up the cost for out-of-state interests to dispose of their solid waste. Furthermore, even as to waste originant in Clarkstown, the ordinance prevents everyone except the favored local operator from performing the initial processing step. The ordinance thus deprives out-of-state businesses of access to a local market. These economic effects are more than enough to bring the Clarkstown ordinance within the purview of the Commerce Clause. It is well settled that actions are within the domain of the Commerce Clause if they burden interstate commerce or impede its free flow. *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 31 (1937).

The real question is whether the flow control ordinance is valid despite its undoubted effect on interstate commerce.

For this inquiry, our case law yields two lines of analysis: first, whether the ordinance discriminates against interstate commerce, *Philadelphia*, 437 U. S., at 624; and second, whether the ordinance imposes a burden on interstate commerce that is "clearly excessive in relation to the putative local benefits," *Pike* v. *Bruce Church, Inc.*, 397 U. S. 137, 142 (1970). As we find that the ordinance discriminates against interstate commerce, we need not resort to the *Pike* test.

The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent. See The Federalist No. 22, pp. 143–145 (C. Rossiter ed. 1961) (A. Hamilton); Madison, Vices of the Political System of the United States, in 2 Writings of James Madison 362–363 (G. Hunt ed. 1901). We have interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State. See, *e. g.*, *Philadelphia, supra* (striking down New Jersey statute that prohibited the import of solid waste); *Hughes* v. *Oklahoma*, 441 U. S. 322 (1979) (striking down Oklahoma law that prohibited the export of natural minnows).

Clarkstown protests that its ordinance does not discriminate because it does not differentiate solid waste on the basis of its geographic origin. All solid waste, regardless of origin, must be processed at the designated transfer station before it leaves the town. Unlike the statute in *Philadelphia*, says the town, the ordinance erects no barrier to the import or export of any solid waste but requires only that the waste be channeled through the designated facility.

Our initial discussion of the effects of the ordinance on interstate commerce goes far toward refuting the town's contention that there is no discrimination in its regulatory scheme. The town's own arguments go the rest of the way. As the town itself points out, what makes garbage a profit-

able business is not its own worth but the fact that its possessor must pay to get rid of it. In other words, the article of commerce is not so much the solid waste itself, but rather the service of processing and disposing of it.

With respect to this stream of commerce, the flow control ordinance discriminates, for it allows only the favored operator to process waste that is within the limits of the town. The ordinance is no less discriminatory because in-state or in-town processors are also covered by the prohibition. In *Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951), we struck down a city ordinance that required all milk sold in the city to be pasteurized within five miles of the city lines. We found it "immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce." *Id.,* at 354, n. 4. Accord, *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources,* 504 U. S., at 361 ("[O]ur prior cases teach that a State (or one of its political subdivisions) may not avoid the strictures of the Commerce Clause by curtailing the movement of articles of commerce through subdivisions of the State, rather than through the State itself").

In this light, the flow control ordinance is just one more instance of local processing requirements that we long have held invalid. See *Minnesota* v. *Barber,* 136 U. S. 313 (1890) (striking down a Minnesota statute that required any meat sold within the State, whether originating within or without the State, to be examined by an inspector within the State); *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928) (striking down a Louisiana statute that forbade shrimp to be exported unless the heads and hulls had first been removed within the State); *Johnson* v. *Haydel,* 278 U. S. 16 (1928) (striking down analogous Louisiana statute for oysters); *Toomer* v. *Witsell,* 334 U. S. 385 (1948) (striking down South Carolina statute that required shrimp fishermen to unload, pack, and stamp their catch before shipping it to another State); *Pike* v. *Bruce Church, Inc., supra* (striking down

Arizona statute that required all Arizona-grown cantaloupes to be packaged within the State prior to export); *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82 (1984) (striking down an Alaska regulation that required all Alaska timber to be processed within the State prior to export). The essential vice in laws of this sort is that they bar the import of the processing service. Out-of-state meat inspectors, or shrimp hullers, or milk pasteurizers, are deprived of access to local demand for their services. Put another way, the offending local laws hoard a local resource—be it meat, shrimp, or milk—for the benefit of local businesses that treat it.

The flow control ordinance has the same design and effect. It hoards solid waste, and the demand to get rid of it, for the benefit of the preferred processing facility. The only conceivable distinction from the cases cited above is that the flow control ordinance favors a single local proprietor. But this difference just makes the protectionist effect of the ordinance more acute. In *Dean Milk*, the local processing requirement at least permitted pasteurizers within five miles of the city to compete. An out-of-state pasteurizer who wanted access to that market might have built a pasteurizing facility within the radius. The flow control ordinance at issue here squelches competition in the waste-processing service altogether, leaving no room for investment from outside.

Discrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest. *Maine* v. *Taylor*, 477 U. S. 131 (1986) (upholding Maine's ban on the import of baitfish because Maine had no other way to prevent the spread of parasites and the adulteration of its native fish species). A number of *amici* contend that the flow control ordinance fits into this narrow class. They suggest that as landfill space

.diminishes and environmental cleanup costs escalate, measures like flow control become necessary to ensure the safe handling and proper treatment of solid waste.

The teaching of our cases is that these arguments must be rejected absent the clearest showing that the unobstructed flow of interstate commerce itself is unable to solve the local problem. The Commerce Clause presumes a national market free from local legislation that discriminates in favor of local interests. Here Clarkstown has any number of nondiscriminatory alternatives for addressing the health and environmental problems alleged to justify the ordinance in question. The most obvious would be uniform safety regulations enacted without the object to discriminate. These regulations would ensure that competitors like Carbone do not underprice the market by cutting corners on environmental safety.

Nor may Clarkstown justify the flow control ordinance as a way to steer solid waste away from out-of-town disposal sites that it might deem harmful to the environment. To do so would extend the town's police power beyond its jurisdictional bounds. States and localities may not attach restrictions to exports or imports in order to control commerce in other States. *Baldwin* v. *G. A. F. Seelig, Inc.*, 294 U. S. 511 (1935) (striking down New York law that prohibited the sale of milk unless the price paid to the original milk producer equaled the minimum required by New York).

The flow control ordinance does serve a central purpose that a nonprotectionist regulation would not: It ensures that the town-sponsored facility will be profitable, so that the local contractor can build it and Clarkstown can buy it back at nominal cost in five years. In other words, as the most candid of *amici* and even Clarkstown admit, the flow control ordinance is a financing measure. By itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce. Otherwise States could impose discriminatory taxes against solid waste origi-

nating outside the State. See *Chemical Waste Management, Inc.* v. *Hunt,* 504 U. S. 334 (1992) (striking down Alabama statute that imposed additional fee on all hazardous waste generated outside the State and disposed of within the State); *Oregon Waste Systems, Inc.* v. *Department of Environmental Quality of Ore., ante,* p. 93 (striking down Oregon statute that imposed additional fee on solid waste generated outside the State and disposed of within the State).

Clarkstown maintains that special financing is necessary to ensure the long-term survival of the designated facility. If so, the town may subsidize the facility through general taxes or municipal bonds. *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269, 278 (1988). But having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State.

Though the Clarkstown ordinance may not in explicit terms seek to regulate interstate commerce, it does so nonetheless by its practical effect and design. In this respect the ordinance is not far different from the state law this Court found invalid in *Buck* v. *Kuykendall,* 267 U. S. 307 (1925). That statute prohibited common carriers from using state highways over certain routes without a certificate of public convenience. Writing for the Court, Justice Brandeis said of the law: "Its primary purpose is not regulation with a view to safety or to conservation of the highways, but the prohibition of competition. It determines not the manner of use, but the persons by whom the highways may be used. It prohibits such use to some persons while permitting it to others for the same purpose and in the same manner." *Id.,* at 315–316.

State and local governments may not use their regulatory power to favor local enterprise by prohibiting patronage of out-of-state competitors or their facilities. We reverse the

judgment and remand the case for proceedings not inconsistent with this decision.

*It is so ordered.*

## APPENDIX TO OPINION OF THE COURT

### TOWN OF CLARKSTOWN

### Local Law No. 9 of the year 1990

A local law entitled, "SOLID WASTE TRANSPORTATION AND DISPOSAL."

Be it enacted by the TOWN BOARD of the Town of CLARKSTOWN as follows:

Section 1.   Definitions

Unless otherwise stated expressly, the following words and expressions, where used in this chapter, shall have the meanings ascribed to them by this section:

ACCEPTABLE WASTE—All residential, commercial and industrial solid waste as defined in New York State Law, and Regulations, including Construction and Demolition Debris. Acceptable Waste shall not include Hazardous Waste, Pathological Waste or sludge.

CONSTRUCTION AND DEMOLITION DEBRIS—Uncontaminated solid waste resulting from the construction, remodeling, repair and demolition of structures and roads; and uncontaminated solid waste consisting of vegetation resulting from land clearing and grubbing, utility line maintenance and seasonal and storm related cleanup.   Such waste includes, but is not limited to bricks, concrete and other masonry materials, soil, rock, wood, wall coverings, plaster, drywall, plumbing fixtures, non-asbestos insulation, roofing shingles, asphaltic pavement, electrical wiring and components containing no hazardous liquids, metals, brush grass clippings and leaves that are incidental to any of the above.

HAZARDOUS WASTE—All solid waste designated as such under the Environmental Conservation Law, the Comprehensive Environmental Response, Compensation and Lia-

bility Act of 1980, the Resource Conservation and Recovery Act of 1976 or any other applicable law.

PATHOLOGICAL WASTE—Waste material which may be considered infectious or biohazardous, originating from hospitals, public or private medical clinics, departments or research laboratories, pharmaceutical industries, blood banks, forensic medical departments, mortuaries, veterinary facilities and other similar facilities and includes equipment, instruments, utensils, fomites, laboratory waste (including pathological specimens and fomites attendant thereto), surgical facilities, equipment, bedding and utensils (including pathological specimens and disposal fomites attendant thereto), sharps (hypodermic needles, syringes, etc.), dialysis unit waste, animal carcasses, offal and body parts, biological materials, (vaccines, medicines, etc.) and other similar materials, but does not include any such waste material which is determined by evidence satisfactory to the Town to have been rendered non-infectious and non-biohazardous.

PERSONS—Any individual, partnership, corporation, association, trust, business trust, joint venturer, governmental body or other entity, howsoever constituted.

UNACCEPTABLE WASTE—Hazardous Waste, Pathological Waste and sludge.

SLUDGE—Solid, semi-solid or liquid waste generated from a sewage treatment plant, wastewater treatment plant, water supply treatment plant, or air pollution control facility.

TOWN—When used herein, refers to the Town of Clarkstown.

Section 2.   General Provisions

A.  Intent; Purpose.

I. The intent and purpose of this chapter is to provide for the transportation and disposition of all solid waste within or generated within the Town of Clarkstown so that all acceptable solid waste generated within the Town is delivered to the Town of Clarkstown solid waste facility situate at Route 303, West Nyack, New York and such other sites,

situate in the Town, as may be approved by the Town for recycling, processing or for other disposition or handling of acceptable solid waste.

II. The powers and duties enumerated in this law constitute proper town purposes intended to benefit the health, welfare and safety of Town residents. Additionally, it is hereby found that, in the exercise of control over the collection, transportation and disposal of solid waste, the Town is exercising essential and proper governmental functions.

B. Supervision and Regulation.

The Town Board hereby designates the Director of the Department of Environmental Control to be responsible for the supervision and regulation of the transportation and disposition of all acceptable waste generated within the Town of Clarkstown. The Director of the Department of Environmental Control shall be responsible for and shall supervise the Town's activities in connection with any waste collection and disposal agreements entered into between the Town and third parties and shall report to the Town Board with respect thereto.

C. Power to Adopt Rules and Regulations.

The Town Board may, after a public hearing, adopt such rules and regulations as may be necessary to effectuate the purposes of this chapter. At least seven (7) business days' prior notice of such public hearing shall be published in the official newspaper of the Town. A copy of all rules and regulations promulgated hereunder and any amendments thereto shall be filed in the office of the Town Clerk upon adoption and shall be effective as provided therein.

Section 3. Collection and Disposal of Acceptable Waste.

A. The removal, transportation and/or disposal of acceptable waste within or generated within the Town of Clarkstown shall be exclusively disposed of, controlled and regulated by the Town under this chapter and Chapter 50 and Chapter 82 of the Clarkstown Town Code, together with such

rules and regulations as the Town has or may from time to time adopt.

B. All acceptable waste, as defined herein, except for construction and demolition debris, shall be removed, transported and/or disposed of only by carters licensed pursuant to the requirements of Chapter 50 of the Clarkstown Town Code and any amendments thereto. All other persons are hereby prohibited from removing, transporting or disposing of acceptable waste, except for construction and demolition debris generated within the Town of Clarkstown, and except as may be provided for herein or in the rules and regulations adopted pursuant to this chapter and/or Chapter 50 of the Clarkstown Town Code.

C. All acceptable waste generated within the territorial limits of the Town of Clarkstown is to be transported and delivered to the Town of Clarkstown solid waste facility located at Route 303, West Nyack, New York or to such other disposal or recycling facilities operated by the Town of Clarkstown,* or to recycling centers established by special permit pursuant to Chapter 106 of the Clarkstown Town Code, except for recyclable materials which are separated from solid waste at the point of origin or generation of such solid waste, which separated recyclable materials may be transported and delivered to facilities within the Town as aforesaid, or to sites outside the town. As to acceptable waste brought to said recycling facilities, the unrecycled residue shall be disposed of at a solid waste facility operated by the Town of Clarkstown.

D. It shall be unlawful to dispose of any acceptable waste generated or collected within the Town at any location other than the facilities or sites set forth in Paragraph "C" above.

---

*In a separate zoning ordinance, the Town declared that it shall have only one designated transfer station. Town of Clarkstown Zoning Code § 106–3.

Section 4.   Disposal of Unacceptable Waste.

A. No unacceptable waste shall be delivered to the Town of Clarkstown solid waste facility situate at Route 303, West Nyack, New York or other solid waste facility operated by the Town of Clarkstown or recycling centers established by special permit pursuant to Chapter 106 of the Clarkstown Town Code by any person, including, without limitation, any licensed carter or any municipality.   Failure to comply with the provisions of this section shall be subject to the provisions with respect to such penalties and enforcement, including the suspension or revocation of licenses and the imposition of fines, in accordance with the provisions of this chapter and/or Chapter 50 of the Clarkstown Town Code and any amendments thereto.   The Town Board of Clarkstown may, by resolution, provide for the disposal of sewer sludge, generated by a municipal sewer system or the Rockland County sewer district, at a disposal facility situate within the Town of Clarkstown.

B. It shall be unlawful, within the Town, to dispose of or attempt to dispose of unacceptable waste of any kind generated within the territorial limits of the Town of Clarkstown, except for sewer sludge as provided for in Section "A" above.

Section 5.   Acceptable and Unacceptable Waste Generated Outside the Town of Clarkstown.

A. It shall be unlawful, within the Town, to dispose of or attempt to dispose of acceptable or unacceptable waste of any kind generated or collected outside the territorial limits of the Town of Clarkstown, except for acceptable waste disposed of at a Town operated facility, pursuant to agreement with the Town of Clarkstown and recyclables, as defined in Chapter 82 of the Clarkstown Town Code, brought to a recycling center established by special permit pursuant to Chapter 106 of the Clarkstown Town Code.

B. It shall be unlawful for any person to import acceptable waste or unacceptable waste from outside the Town of

Clarkstown and dump same on any property located within the Town of Clarkstown and to proceed to sift, sort, mulch or otherwise mix the said material with dirt, water, garbage, rubbish or other substance, having the effect of concealing the contents or origin of said mixture. This provision shall not apply to composting of acceptable waste carried out by the Town of Clarkstown.

Section 6. Fees for Disposal of Acceptable Waste at Town Operated Facilities.

There shall be separate fees established for disposal of acceptable waste at Town operated disposal facilities. The Town Board, by resolution adopted from time to time, shall fix the various fees to be collected at said facilities. The initial fees to be collected are those adopted by the Town Board on December 11, 1990 by Resolution Number 1097.

Section 7. Penalties for Offenses.

Notwithstanding any other provision of this chapter, the violation of any provision of this chapter shall be punishable by a fine of not more than one thousand dollars ($1,000.00) or by imprisonment for a period not exceeding fifteen (15) days for each offense, or by both fine and imprisonment, and each day that such violation shall be permitted to continue shall constitute a separate offense hereunder.

Section 8. Repealer; Severability.

Ordinances and local laws or parts of ordinances or local laws heretofore enacted and inconsistent with any of the terms or provisions of this chapter are hereby repealed. In the event that any portion of this chapter shall be declared invalid by a court of competent jurisdiction, such invalidity shall not be deemed to affect the remaining portions hereof.

Section 9. When Effective.

This chapter shall take effect immediately upon filing in the office of the Secretary of State.

JUSTICE O'CONNOR, concurring in the judgment.

The town of Clarkstown's flow control ordinance requires all "acceptable waste" generated or collected in the town to be disposed of only at the town's solid waste facility. Town of Clarkstown, Local Law 9, §§ 3.C–D (1990) (Local Law 9). The Court holds today that this ordinance violates the Commerce Clause because it discriminates against interstate commerce. *Ante*, at 390. I agree with the majority's ultimate conclusion that the ordinance violates the dormant Commerce Clause. In my view, however, the town's ordinance is unconstitutional not because of facial or effective discrimination against interstate commerce, but rather because it imposes an excessive burden on interstate commerce. I also write separately to address the contention that flow control ordinances of this sort have been expressly authorized by Congress, and are thus outside the purview of the dormant Commerce Clause.

## I

The scope of the dormant Commerce Clause is a judicial creation. On its face, the Clause provides only that "[t]he Congress shall have Power . . . To regulate Commerce . . . among the several States . . . ." U. S. Const., Art. I, § 8, cl. 3. This Court long ago concluded, however, that the Clause not only empowers Congress to regulate interstate commerce, but also imposes limitations on the States in the absence of congressional action:

> "This principle that our economic unit is the Nation, which alone has the gamut of powers necessary to control of the economy, including the vital power of erecting customs barriers against foreign competition, has as its corollary that the states are not separable economic units. . . . [W]hat is ultimate is the principle that one state in its dealings with another may not place itself in a position of economic isolation." *H. P. Hood & Sons,*

*Inc.* v. *Du Mond,* 336 U. S. 525, 537–538 (1949) (internal quotation marks and citations omitted).

Our decisions therefore hold that the dormant Commerce Clause forbids States and their subdivisions to regulate interstate commerce.

We have generally distinguished between two types of impermissible regulations. A facially nondiscriminatory regulation supported by a legitimate state interest which incidentally burdens interstate commerce is constitutional unless the burden on interstate trade is clearly excessive in relation to the local benefits. See *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority,* 476 U. S. 573, 579 (1986); *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137, 142 (1970). Where, however, a regulation "affirmatively" or "clearly" discriminates against interstate commerce on its face or in practical effect, it violates the Constitution unless the discrimination is demonstrably justified by a valid factor unrelated to protectionism. See *Wyoming* v. *Oklahoma,* 502 U. S. 437, 454 (1992); *Maine* v. *Taylor,* 477 U. S. 131, 138 (1986). Of course, there is no clear line separating these categories. "In either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman Distillers, supra,* at 579.

Local Law 9 prohibits anyone except the town-authorized transfer station operator from processing discarded waste and shipping it out of town. In effect, the town has given a waste processing monopoly to the transfer station. The majority concludes that this processing monopoly facially discriminates against interstate commerce. *Ante,* at 391–392. In support of this conclusion, the majority cites previous decisions of this Court striking down regulatory enactments requiring that a particular economic activity be performed within the jurisdiction. See, *e. g., Dean Milk Co.* v. *Madison,* 340 U. S. 349 (1951) (unconstitutional for city to require milk to be pasteurized within five miles of the city); *Minnesota* v. *Barber,* 136 U. S. 313 (1890) (unconstitutional for State

to require meat sold within the State to be examined by state inspector); *Foster-Fountain Packing Co.* v. *Haydel*, 278 U. S. 1 (1928) (unconstitutional for State to require that shrimp heads and hulls must be removed before shrimp can be removed from the State); *South-Central Timber Development, Inc.* v. *Wunnicke*, 467 U. S. 82 (1984) (unconstitutional for State to require all timber to be processed within the State prior to export).

Local Law 9, however, lacks an important feature common to the regulations at issue in these cases—namely, discrimination on the basis of geographic origin. In each of the cited cases, the challenged enactment gave a competitive advantage to local business *as a group* vis-à-vis their out-of-state or nonlocal competitors *as a group*. In effect, the regulating jurisdiction—be it a State *(Pike)*, a county *(Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources,* 504 U. S. 353 (1992)), or a city *(Dean Milk)*—drew a line around itself and treated those inside the line more favorably than those outside the line. Thus, in *Pike*, the Court held that an Arizona law requiring that Arizona cantaloupes be packaged in Arizona before being shipped out of state facially discriminated against interstate commerce: The benefits of the discriminatory scheme benefited the Arizona packaging industry, at the expense of its competition in California. Similarly, in *Dean Milk*, on which the majority heavily relies, the city of Madison drew a line around its perimeter and required that all milk sold in the city be pasteurized only by dairies located inside the line. This type of geographic distinction, which confers an economic advantage on local interests in general, is common to all the local processing cases cited by the majority. And the Court has, I believe, correctly concluded that these arrangements are protectionist either in purpose or practical effect, and thus amount to virtually *per se* discrimination.

In my view, the majority fails to come to terms with a significant distinction between the laws in the local process-

ing cases discussed above and Local Law 9. Unlike the regulations we have previously struck down, Local Law 9 does not give more favorable treatment to local interests as a group as compared to out-of-state or out-of-town economic interests. Rather, the garbage sorting monopoly is achieved at the expense of all competitors, be they local or nonlocal. That the ordinance does not discriminate on the basis of geographic origin is vividly illustrated by the identity of the plaintiffs in this very action: Petitioners are *local* recyclers, physically located *in Clarkstown,* that desire to process waste themselves, and thus bypass the town's designated transfer facility. Because in-town processors—like petitioners—and out-of-town processors are treated equally, I cannot agree that Local Law 9 "discriminates" against interstate commerce. Rather, Local Law 9 "discriminates" evenhandedly against all potential participants in the waste processing business, while benefiting only the chosen operator of the transfer facility.

I believe this distinction has more doctrinal significance than the majority acknowledges. In considering state health and safety regulations such as Local Law 9, we have consistently recognized that the fact that interests within the regulating jurisdiction are equally affected by the challenged enactment counsels against a finding of discrimination. And for good reason. The existence of substantial in-state interests harmed by a regulation is "a powerful safeguard" against legislative discrimination. *Minnesota* v. *Clover Leaf Creamery Co.,* 449 U. S. 456, 473, n. 17 (1981). The Court generally defers to health and safety regulations because "their burden usually falls on local economic interests as well as other States' economic interests, thus insuring that a State's own political processes will serve as a check against unduly burdensome regulations." *Raymond Motor Transp., Inc.* v. *Rice,* 434 U. S. 429, 444, n. 18 (1978). See also *Kassel* v. *Consolidated Freightways Corp. of Del.,* 450 U. S. 662, 675 (1981) (same). Thus, while there is no bright

line separating those enactments which are virtually *per se* invalid and those which are not, the fact that in-town competitors of the transfer facility are equally burdened by Local Law 9 leads me to conclude that Local Law 9 does not discriminate against interstate commerce.

## II

That the ordinance does not discriminate against interstate commerce does not, however, end the Commerce Clause inquiry. Even a nondiscriminatory regulation may nonetheless impose an excessive burden on interstate trade when considered in relation to the local benefits conferred. See *Brown-Forman Distillers*, 476 U. S., at 579. Indeed, we have long recognized that "a burden imposed by a State upon interstate commerce is not to be sustained simply because the statute imposing it applies alike to . . . the people of the State enacting such statute." *Brimmer* v. *Rebman*, 138 U. S. 78, 83 (1891) (internal quotation marks and citation omitted). Moreover, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Pike*, 397 U. S., at 142. Judged against these standards, Local Law 9 fails.

The local interest in proper disposal of waste is obviously significant. But this interest could be achieved by simply requiring that all waste disposed of in the town be properly processed *somewhere*. For example, the town could ensure proper processing by setting specific standards with which all town processors must comply.

In fact, however, the town's purpose is narrower than merely ensuring proper disposal. Local Law 9 is intended to ensure the financial viability of the transfer facility. I agree with the majority that this purpose can be achieved by other means that would have a less dramatic impact on the flow of goods. For example, the town could finance the

406

project by imposing taxes, by issuing municipal bonds, or
even by lowering its price for processing to a level competi-
tive with other waste processing facilities. But by requiring
that all waste be processed at the town's facility, the ordi-
nance "squelches competition in the waste-processing service
altogether, leaving no room for investment from outside."
*Ante,* at 392.

In addition, "'[t]he practical effect of [Local Law 9] must
be evaluated not only by considering the consequences of the
statute itself, but also by considering how the challenged
statute may interact with the legitimate regulatory regimes
of the other States and what effect would arise if not one, but
many or every, [jurisdiction] adopted similar legislation.'"
*Wyoming* v. *Oklahoma,* 502 U. S., at 453–454 (quoting *Healy*
v. *Beer Institute,* 491 U. S. 324, 336 (1989)). This is not a
hypothetical inquiry. Over 20 States have enacted statutes
authorizing local governments to adopt flow control laws.*
If the localities in these States impose the type of restriction
on the movement of waste that Clarkstown has adopted, the
free movement of solid waste in the stream of commerce will
be severely impaired. Indeed, pervasive flow control would
result in the type of balkanization the Clause is primarily
intended to prevent. See *H. P. Hood & Sons,* 336 U. S., at
537–538.

---

*Colo. Rev. Stat. § 30–20–107 (Supp. 1993); Conn. Gen. Stat. § 22a–220a
(1993); Del. Code Ann., Tit. 7, § 6406(31) (1991); Fla. Stat. § 403.713 (1991);
Haw. Rev. Stat. § 340A–3(a) (1985); Ind. Code §§ 36–9–31–3 and –4 (1993);
Iowa Code § 28G.4 (1987); La. Rev. Stat. Ann. § 30:2307(9) (West 1989); Me.
Rev. Stat. Ann., Tit. 38, § 1304–B(2) (1964); Minn. Stat. § 115A.80 (1992);
Miss. Code Ann. § 17–17–319 (Supp. 1993); Mo. Rev. Stat. § 260.202 (Supp.
1993); N. J. Stat. Ann. §§ 13.1E–22, 48:13A–5 (West 1991 and Supp. 1993);
N. C. Gen. Stat. § 130A–294 (1992); N. D. Cent. Code §§ 23–29–06(6) and
(8) (Supp. 1993); Ore. Rev. Stat. §§ 268.317(3) and (4) (1991); Pa. Stat. Ann.,
Tit. 53, § 4000.303(e) (Purdon Supp. 1993); R. I. Gen. Laws § 23–19–10(40)
(1956); Tenn. Code Ann. § 68–211–814 (Supp. 1993); Vt. Stat. Ann., Tit. 24,
§ 2203b (1992); Va. Code Ann. § 15.1–28.01 (Supp. 1993).

Given that many jurisdictions are contemplating or enacting flow control, the potential for conflicts is high. For example, in the State of New Jersey, just south of Clarkstown, local waste may be removed from the State for the sorting of recyclables "as long as the residual solid waste is returned to New Jersey." Brief for New Jersey as *Amicus Curiae* 5. Under Local Law 9, however, if petitioners bring waste from New Jersey for recycling at their Clarkstown operation, the residual waste may not be returned to New Jersey, but must be transported to Clarkstown's transfer facility. As a consequence, operations like petitioners' cannot comply with the requirements of both jurisdictions. Nondiscriminatory state or local laws which actually conflict with the enactments of other States are constitutionally infirm if they burden interstate commerce. See *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520, 526–530 (1959) (unconstitutional for Illinois to require truck mudguards when that requirement conflicts with the requirements of other States); *Southern Pacific Co.* v. *Arizona ex rel. Sullivan*, 325 U. S. 761, 773–774 (1945) (same). The increasing number of flow control regimes virtually ensures some inconsistency between jurisdictions, with the effect of eliminating the movement of waste between jurisdictions. I therefore conclude that the burden Local Law 9 imposes on interstate commerce is excessive in relation to Clarkstown's interest in ensuring a fixed supply of waste to supply its project.

## III

Although this Court can—and often does—enforce the dormant aspect of the Commerce Clause, the Clause is primarily a grant of congressional authority to regulate commerce among the States. *Amicus* National Association of Bond Lawyers (NABL) argues that the flow control ordinance in this case has been authorized by Congress. Given the residual nature of our authority under the Clause, and

because the argument that Congress has in fact authorized flow control is substantial, I think it appropriate to address it directly.

Congress must be "unmistakably clear" before we will conclude that it intended to permit state regulation which would otherwise violate the dormant Commerce Clause. *South-Central Timber*, 467 U. S., at 91 (plurality opinion). See also *Sporhase* v. *Nebraska ex rel. Douglas*, 458 U. S. 941, 960 (1982) (finding consent only where "Congress' intent and policy to sustain state legislation from attack under the Commerce Clause was expressly stated") (citations and internal quotation marks omitted). The State or locality has the burden of demonstrating this intent. *Wyoming* v. *Oklahoma*, 502 U. S., at 458.

*Amicus* NABL argues that Subchapter IV of the Resource Conservation and Recovery Act of 1976 (RCRA), 90 Stat. 2813, as amended, 42 U. S. C. § 6941 *et seq.*, and its amendments, remove the constitutional constraints on local implementation of flow control. RCRA is a sweeping statute intended to regulate solid waste from cradle to grave. In addition to providing specific federal standards for the management of solid waste, RCRA Subchapter IV governs "State or Regional Solid Waste Plans." Among the objectives of the subchapter is to "assist in developing and encouraging methods for the disposal of solid waste which are environmentally sound"; this is to be accomplished by federal "assistance to States or regional authorities for comprehensive planning pursuant to Federal guidelines." § 6941.

Under RCRA, States are to submit solid waste management plans that "prohibit the establishment of new open dumps within the State," and ensure that solid waste will be "utilized for resource recovery or . . . disposed of in sanitary landfills . . . or otherwise disposed of in an environmentally sound manner." § 6943(a)(2). The plans must also ensure that state and local governments not be "prohibited under State or local law from negotiating and entering into long-

term contracts for the supply of solid waste to resource recovery facilities [or] from entering into long-term contracts for the operation of such facilities." § 6943(a)(5).

*Amicus* also points to a statement in a House Report addressing § 6943(a)(5), a statement evincing some concern with flow control:

> "This prohibition [on state or local laws prohibiting long-term contracts] is not to be construed to affect state planning *which may require all discarded materials to be transported to a particular location. . . ."* H. R. Rep. No. 94–1491, p. 34 (1976) (emphasis added).

Finally, in the Solid Waste Disposal Act Amendments of 1980, Congress authorized the Environmental Protection Agency (EPA) to "provide technical assistance to States [and local governments] to assist in the removal or modification of legal, institutional, and economic impediments which have the effect of impeding the development of systems and facilities [for resource recovery]." § 6948(d)(3). Among the obstacles to effective resource recovery are "impediments to institutional arrangements necessary to undertake projects . . . *including the creation of special districts, authorities, or corporations where necessary having the power to secure the supply of waste of a project."* § 6948(d)(3)(C) (emphasis added).

I agree with *amicus* NABL that these references indicate that Congress expected local governments to implement some form of flow control. Nonetheless, they neither individually nor cumulatively rise to the level of the "explicit" authorization required by our dormant Commerce Clause decisions. First, the primary focus of the references is on legal impediments imposed as a result of state—not federal—law. In addition, the reference to local authority to "secure the supply of waste" is contained in § 6948(d)(3)(C), which is a delegation not to the States but to *EPA* of authority to assist

local government in solving waste supply problems. EPA has stated in its implementing regulations that the "State plan should provide for substate cooperation and policies for free and unrestricted movement of solid and hazardous waste across State and local boundaries." 40 CFR § 256.42(h) (1993). And while the House Report seems to contemplate that municipalities may require waste to be brought to a particular location, this stronger language is not reflected in the text of the statute. Cf. *United States* v. *Nordic Village, Inc.*, 503 U. S. 30, 37 (1992) (for waiver of sovereign immunity, "[i]f clarity does not exist [in the text], it cannot be supplied by a committee report"); *Dellmuth* v. *Muth*, 491 U. S. 223, 230 (1989) (same). In short, these isolated references do not satisfy our requirement of an explicit statutory authorization.

It is within Congress' power to authorize local imposition of flow control. Should Congress revisit this area, and enact legislation providing a clear indication that it intends States and localities to implement flow control, we will, of course, defer to that legislative judgment. Until then, however, Local Law 9 cannot survive constitutional scrutiny. Accordingly, I concur in the judgment of the Court.

JUSTICE SOUTER, with whom THE CHIEF JUSTICE and JUSTICE BLACKMUN join, dissenting.

The majority may invoke "well-settled principles of our Commerce Clause jurisprudence," *ante*, at 386, but it does so to strike down an ordinance unlike anything this Court has ever invalidated. Previous cases have held that the "negative" or "dormant" aspect of the Commerce Clause renders state or local legislation unconstitutional when it discriminates against out-of-state or out-of-town businesses such as those that pasteurize milk, hull shrimp, or mill lumber, and the majority relies on these cases because of what they have in common with this one: out-of-state processors are ex-

cluded from the local market (here, from the market for trash processing services). What the majority ignores, however, are the differences between our local processing cases and this one: the exclusion worked by Clarkstown's Local Law 9 bestows no benefit on a class of local private actors, but instead directly aids the government in satisfying a traditional governmental responsibility. The law does not differentiate between all local and all out-of-town providers of a service, but instead between the one entity responsible for ensuring that the job gets done and all other enterprises, regardless of their location. The ordinance thus falls outside that class of tariff or protectionist measures that the Commerce Clause has traditionally been thought to bar States from enacting against each other, and when the majority subsumes the ordinance within the class of laws this Court has struck down as facially discriminatory (and so avails itself of our "virtually *per se* rule" against such statutes, see *Philadelphia* v. *New Jersey*, 437 U. S. 617, 624 (1978)), the majority is in fact greatly extending the Clause's dormant reach.

There are, however, good and sufficient reasons against expanding the Commerce Clause's inherent capacity to trump exercises of state authority such as the ordinance at issue here. There is no indication in the record that any out-of-state trash processor has been harmed, or that the interstate movement or disposition of trash will be affected one whit. To the degree Local Law 9 affects the market for trash processing services, it does so only by subjecting Clarkstown residents and businesses to burdens far different from the burdens of local favoritism that dormant Commerce Clause jurisprudence seeks to root out. The town has found a way to finance a public improvement, not by transferring its cost to out-of-state economic interests, but by spreading it among the local generators of trash, an equitable result with tendencies that should not disturb the Commerce Clause and should not be disturbed by us.

I

Prior to the 1970's, getting rid of the trash in Clarkstown was just a matter of taking it to the local dump. But over the course of that decade, state regulators cited the town for dumping in violation of environmental laws, and in August 1989 the town entered into a consent decree with the New York State Department of Environmental Conservation, promising to close the landfill, clean up the environmental damage, and make new arrangements to dispose of the town's solid waste. Clarkstown agreed to build a "transfer station" where the town's trash would be brought for sorting out recyclable material and baling the nonrecyclable residue for loading into long-haul trucks bound for out-of-state disposal sites.

Instead of building the transfer station itself, Clarkstown contracted with a private company to build the station and run it for five years, after which the town could buy it for $1. The town based the size of the facility on its best estimate of the amount of trash local residents would generate and undertook to deliver that amount to the transfer station each year, or to pay a substantial penalty to compensate for any shortfall. This "put or pay" contract, together with the right to charge an $81 "tipping" fee for each ton of waste collected at the transfer station, was meant to assure the company its return on investment.

Local Law 9, the ordinance at issue here, is an integral part of this financing scheme. It prohibits individual trash generators within the town from evading payment of the $81 tipping fee by requiring that all residential, commercial, and industrial waste generated or collected within the town be delivered to the transfer station. While Clarkstown residents may dump their waste at another locally licensed recycling center, once such a private recycler culls out the recyclable materials, it must dispose of any residue the same way other Clarkstown residents do, by taking it to the town's

transfer station. Local Law 9, §§ 3.C, 3.D (1990).[1] If out-of-towners wish to dispose of their waste in Clarkstown or recycle it there, they enter the town subject to the same restrictions as Clarkstown residents, in being required to use only the town-operated transfer station or a licensed recycling center. § 5.A.

Petitioner C & A Carbone, Inc., operated a recycling center in Clarkstown, according to a state permit authorizing it to collect waste, separate out the recyclables for sale, and dispose of the rest. In violation of Local Law 9, Carbone failed to bring this nonrecyclable residue to the town transfer station, but took it directly to out-of-state incinerators and landfills, including some of the very same ones to which the Clarkstown transfer station sends its trash. Apparently, Carbone bypassed the Clarkstown facility on account of the $81 tipping fee, saving Carbone money, but costing the town thousands in lost revenue daily. In this resulting legal action, Carbone's complaint is one that any Clarkstown trash generator could have made: the town has created a monopoly on trash processing services, and residents are no longer free to provide these services for themselves or to contract for them with others at a mutually agreeable price.

## II

We are not called upon to judge the ultimate wisdom of creating this local monopoly, but we are asked to say whether Clarkstown's monopoly violates the Commerce Clause, as long read by this Court to limit the power of state and local governments to discriminate against interstate commerce:

---

[1] The ordinance has exceptions not at issue here for hazardous waste, pathological waste, and sludge, and for source-separated recyclables, which can be disposed of within or outside the town. Local Law 9, §§ 1, 3.C (1990).

> "[The] 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors. Thus, state statutes that clearly discriminate against interstate commerce are routinely struck down, unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *New Energy Co. of Ind.* v. *Limbach*, 486 U. S. 269, 273–274 (1988) (citations omitted).

This limitation on the state and local power has been seen implicit in the Commerce Clause because, as the majority recognizes, the Framers sought to dampen regional jealousies in general and, in particular, to eliminate retaliatory tariffs, which had poisoned commercial relations under the Articles of Confederation. *Ante,* at 390. Laws that hoard for local businesses the right to serve local markets or develop local resources work to isolate States from each other and to incite retaliation, since no State would stand by while another advanced the economic interests of its own business classes at the expense of its neighbors.

## A

The majority argues that resolution of the issue before us is controlled by a line of cases in which we have struck down state or local laws that discriminate against out-of-state or out-of-town providers of processing services. See *ante,* at 391–392. With perhaps one exception,[2] the laws invalidated

---

[2] The arguable exception is *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970), where the Court invalidated an administrative order issued pursuant to a facially neutral statute. While the order discriminated on its face, prohibiting the interstate shipment of respondent's cantaloupes unless they were first packaged locally, the statute it sought to enforce merely required that Arizona-grown cantaloupes advertise their State of origin on each package. In Part III, I discuss the line of cases in which we have struck down statutes that, although lacking explicit geographical sorting mechanisms, are discriminatory in practical effect.

in those cases were patently discriminatory, differentiating by their very terms between in-state and out-of-state (or local and nonlocal) processors. One ordinance, for example, forbad selling pasteurized milk "'unless the same shall have been pasteurized and bottled . . . within a radius of five miles from the central portion of the City of Madison . . . .'"[3] *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 350, n. 1 (1951) (quoting General Ordinances of the City of Madison § 7.21 (1949)). The other laws expressly discriminated against commerce crossing state lines, placing these local processing cases squarely within the larger class of cases in which this Court has invalidated facially discriminatory legislation.[4]

As the majority recognizes, Local Law 9 shares two features with these local processing cases. It regulates a processing service available in interstate commerce, *i. e.,* the sorting and baling of solid waste for disposal. And it does so in a fashion that excludes out-of-town trash processors by its very terms. These parallels between Local Law 9 and the statutes previously invalidated confer initial plausibility on the majority's classification of this case with those earlier ones on processing, and they even bring this one within the most general language of some of the earlier cases, abhorring

---

[3] The area encompassed by this provision included all of Madison except the runways of the municipal airport, plus a small amount of unincorporated land. See The Madison and Wisconsin Foundation, Map of the City of Madison (1951).

[4] See, *e. g., Chemical Waste Management, Inc.* v. *Hunt,* 504 U. S. 334 (1992) (Alabama statute taxing hazardous waste not originating in State); *Wyoming* v. *Oklahoma,* 502 U. S. 437 (1992) (Oklahoma statute requiring power plants to burn at least 10 percent Oklahoma-mined coal); *New Energy Co. of Ind.* v. *Limbach,* 486 U. S. 269 (1988) (Ohio statute awarding tax credit for sales of ethanol only if it is produced in Ohio or in a State that awards similar tax breaks for Ohio-produced ethanol); *New England Power Co.* v. *New Hampshire,* 455 U. S. 331 (1982) (New Hampshire statute prohibiting hydroelectric power from being sold out of State without permission from the State's Public Utilities Commission); *Hughes* v. *Oklahoma,* 441 U. S. 322 (1979) (Oklahoma law forbidding out-of-state sale of natural minnows).

the tendency of such statutes "to impose an artificial rigidity on the economic pattern of the industry," *Toomer* v. *Witsell,* 334 U. S. 385, 403–404 (1948).

## B

There are, however, both analytical and practical differences between this and the earlier processing cases, differences the majority underestimates or overlooks but which, if given their due, should prevent this case from being decided the same way. First, the terms of Clarkstown's ordinance favor a single processor, not the class of all such businesses located in Clarkstown. Second, the one proprietor so favored is essentially an agent of the municipal government, which (unlike Carbone or other private trash processors) must ensure the removal of waste according to acceptable standards of public health. Any discrimination worked by Local Law 9 thus fails to produce the sort of entrepreneurial favoritism we have previously defined and condemned as protectionist.

## 1

The outstanding feature of the statutes or ordinances reviewed in the local processing cases is their distinction between two classes of private economic actors according to location, favoring shrimp hullers within Louisiana, milk pasteurizers within five miles of the center of Madison, and so on. See *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1 (1928); *Dean Milk Co.* v. *Madison, supra.* Since nothing in these local processing laws prevented a proliferation of local businesses within the State or town, the out-of-town processors were not excluded as part and parcel of a general exclusion of private firms from the market, but as a result of discrimination among such firms according to geography alone. It was because of that discrimination in favor of local businesses, preferred at the expense of their out-of-town or out-of-state competitors, that the Court struck down those local process-

ing laws[5] as classic examples of the economic protectionism the dormant Commerce Clause jurisprudence aims to prevent. In the words of one commentator summarizing our case law, it is laws "adopted for the purpose of improving the competitive position of local economic actors, just because they are local, vis-à-vis their foreign competitors" that offend the Commerce Clause. Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091, 1138 (1986). The Commerce Clause does not otherwise protect access to local markets. *Id.*, at 1128.[6]

---

[5] See *South-Central Timber Development, Inc.* v. *Wunnicke,* 467 U. S. 82, 92 (1984) (quoting *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.,* 303 U. S. 177, 185, n. 2 (1938)) (danger lies in regulation whose "'burden falls principally upon those without the state'"); *Dean Milk Co.* v. *Madison,* 340 U. S. 349, 354 (1951) (in "erecting an economic barrier protecting a major local industry against competition from without the State, Madison plainly discriminates against interstate commerce. This it cannot do . . ."); *Foster-Fountain Packing Co.* v. *Haydel,* 278 U. S. 1, 13 (1928) (statute unconstitutional because it "favor[s] the canning of the meat and the manufacture of bran in Louisiana" instead of Biloxi); *Minnesota* v. *Barber,* 136 U. S. 313, 323 (1890) (statute infirm because its necessary result is "discrimination against the products and business of other States in favor of the products and business of Minnesota"). See also *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources,* 504 U. S. 353, 361 (1992) (statute infirm because it protects "local waste producers . . . from competition from out-of-state waste producers who seek to use local waste disposal areas"); *Philadelphia* v. *New Jersey,* 437 U. S. 617, 626–627 (1978) (New Jersey "may not . . . discriminat[e] against articles of commerce coming from outside the State unless there is some reason, apart from their origin, to treat them differently").

[6] See also Smith, State Discriminations Against Interstate Commerce, 74 Calif. L. Rev. 1203, 1204, 1213 (1986) ("The nub of the matter is that discriminatory regulations are almost invariably invalid, whereas nondiscriminatory regulations are much more likely to survive"; "[a] regulation is discriminatory if it imposes greater economic burdens on those outside the state, to the economic advantage of those within"); L. Tribe, American Constitutional Law 417 (2d ed. 1988) ("[T]he negative implications of the commerce clause derive principally from a *political* theory of union, not

The majority recognizes, but discounts, this difference between laws favoring all local actors and this law favoring a single municipal one. According to the majority, "this difference just makes the protectionist effect of the ordinance more acute" because outside investors cannot even build competing facilities within Clarkstown. *Ante,* at 392. But of course Clarkstown investors face the same prohibition, which is to say that Local Law 9's exclusion of outside capital is part of a broader exclusion of private capital, not a discrimination against out-of-state investors as such.[7] Cf. *Lewis* v. *BT Investment Managers, Inc.,* 447 U. S. 27 (1980) (striking down statute prohibiting businesses owned by out-of-state banks, bank holding companies, or trust companies from providing investment advisory services). Thus, while these differences may underscore the ordinance's anticompetitive effect, they substantially mitigate any protectionist effect, for subjecting out-of-town investors and facilities to the same constraints as local ones is not economic protectionism. See *New Energy Co. of Ind.* v. *Limbach,* 486 U. S., at 273–274.[8]

---

from an *economic* theory of free trade. The function of the clause is to ensure national solidarity, not economic efficiency").

[7] The record does not indicate whether local or out-of-state investors own the private firm that built Clarkstown's transfer station for the municipality.

[8] In a potentially related argument, the majority says our case law supports the proposition that an "ordinance is no less discriminatory because in-state or in-town processors are also covered by [its] prohibition." *Ante,* at 391. If this statement is understood as doing away with the distinction between laws that discriminate based on geography and those that do not, authority for it is lacking. The majority supports its statement by citing from a footnote in *Dean Milk,* that "[i]t is immaterial that Wisconsin milk from outside the Madison area is subjected to the same proscription as that moving in interstate commerce," 340 U. S., at 354, n. 4, but that observation merely recognized that our dormant Commerce Clause jurisprudence extends to municipalities as well as to States and invalidates geographical restrictions phrased in miles as well as in terms of political boundaries. This reading is confirmed by the fact that the

## 2

Nor is the monopolist created by Local Law 9 just another private company successfully enlisting local government to protect the jobs and profits of local citizens. While our previous local processing cases have barred discrimination in markets served by private companies, Clarkstown's transfer station is essentially a municipal facility, built and operated under a contract with the municipality and soon to revert entirely to municipal ownership.[9] This, of course, is no mere coincidence, since the facility performs a municipal function that tradition as well as state and federal law recognize as the domain of local government. Throughout the history of this country, municipalities have taken responsibility for disposing of local garbage to prevent noisome smells, obstruction of the streets, and threats to public health,[10] and today

---

*Dean Milk* Court's only explanation for its statement was to cite a case striking down a statute forbidding the selling of " 'any fresh meats . . . slaughtered one hundred miles or over from the place at which it is offered for sale, until and except it has been inspected' " at a cost to its owner of a penny per pound. *Brimmer* v. *Rebman*, 138 U. S. 78, 80 (1891) (quoting Acts of Va. 1889–1890, p. 63, ch. 80). That the majority here cites also to *Fort Gratiot Landfill* v. *Michigan Dept. of Natural Resources*, *supra*, may indicate that it reads *Dean Milk* the same way I do, but then it cannot use the case to stand for the more radical proposition I quoted above.

[9] At the end of a 5-year term, during which the private contractor receives profits sufficient to induce it to provide the plant in the first place, the town will presumably step into the contractor's shoes for the nominal dollar. Such contracts, enlisting a private company to build, operate, and then transfer to local government an expensive public improvement, enable municipalities to acquire public facilities without resorting to municipal funds or credit.

[10] For example, in 1764 the South Carolina Legislature established a street commission for Charleston with the power "to remove all filth and rubbish, to such proper place or places, in or near the said town, as they . . . shall allot . . . ." Act of Aug. 10, 1764, ¶ 1. In New Amsterdam a century earlier, "[t]he burgomasters and *schepens* ordained that all such refuse be brought to dumping-grounds near the City Hall and the gallows

78 percent of landfills receiving municipal solid waste are owned by local governments. See U. S. Environmental Protection Agency, Resource Conservation and Recovery Act, Subtitle D Study: Phase 1 Report, p. 4–7 (Oct. 1986) (Table 4–2). The National Government provides "technical and financial assistance to States or regional authorities for comprehensive planning" with regard to the disposal of solid waste, 42 U. S. C. § 6941, and the State of New York authorizes local governments to prepare such management plans for the proper disposal of all solid waste generated within their jurisdictions, N. Y. Envir. Conserv. Law § 27–0107 (McKinney Supp. 1994). These general provisions underlie Clarkstown's more specific obligation (under its consent decree with the New York State Department of Environmental Conservation) to establish a transfer station in place of the old town dump, and it is to finance this transfer station that Local Law 9 was passed.

The majority ignores this distinction between public and private enterprise, equating Local Law 9's "hoard[ing]" of solid waste for the municipal transfer station with the design and effect of ordinances that restrict access to local markets for the benefit of local private firms. *Ante*, at 392. But private businesses, whether local or out of State, first serve the

---

nor to other designated places." M. Goodwin, Dutch and English on the Hudson 105 (1977 ed.).

Indeed, some communities have employed flow control ordinances in pursuit of these goals, ordinances this Court has twice upheld against constitutional attack. See *California Reduction Co.* v. *Sanitary Reduction Works*, 199 U. S. 306 (1905) (upholding against a takings challenge an ordinance requiring that all garbage in San Francisco be disposed of, for a fee, at facilities belonging to F. E. Sharon); *Gardner* v. *Michigan*, 199 U. S. 325 (1905) (upholding against due process challenge an ordinance requiring that all garbage in Detroit be collected and disposed of by a single city contractor). It is not mere inattention that has left these fine old cases free from subsequent aspersion, for they illustrate that even at the height of the *Lochner* era the Court recognized that for municipalities struggling to abate their garbage problems, the Constitution did not require unimpeded private enterprise.

private interests of their owners, and there is therefore only rarely a reason other than economic protectionism for favoring local businesses over their out-of-town competitors. The local government itself occupies a very different market position, however, being the one entity that enters the market to serve the public interest of local citizens quite apart from private interest in private gain. Reasons other than economic protectionism are accordingly more likely to explain the design and effect of an ordinance that favors a public facility. The facility as constructed might, for example, be one that private economic actors, left to their own devices, would not have built, but which the locality needs in order to abate (or guarantee against creating) a public nuisance. There is some evidence in this case that this is so, as the New York State Department of Environmental Conservation would have had no reason to insist that Clarkstown build its own transfer station if the private market had furnished adequate processing capacity to meet Clarkstown's needs. An ordinance that favors a municipal facility, in any event, is one that favors the public sector, and if "we continue to recognize that the States occupy a special and specific position in our constitutional system and that the scope of Congress' authority under the Commerce Clause must reflect that position," *Garcia* v. *San Antonio Metropolitan Transit Authority*, 469 U. S. 528, 556 (1985), then surely this Court's dormant Commerce Clause jurisprudence must itself see that favoring state-sponsored facilities differs from discriminating among private economic actors, and is much less likely to be protectionist.

3

Having established that Local Law 9 does not serve the competitive class identified in previous local processing cases and that Clarkstown differs correspondingly from other local processors, we must ask whether these differences justify a standard of dormant Commerce Clause review that differs

from the virtually fatal scrutiny imposed in those earlier cases. I believe they do.

The justification for subjecting the local processing laws and the broader class of clearly discriminatory commercial regulation to near-fatal scrutiny is the virtual certainty that such laws, at least in their discriminatory aspect, serve no legitimate, nonprotectionist purpose. See *Philadelphia* v. *New Jersey*, 437 U. S., at 624 ("[W]here simple economic protectionism is effected by state legislation, a virtually *per se* rule of invalidity has been erected").[11] Whether we find "the evil of protectionism," *id.*, at 626, in the clear import of specific statutory provisions or in the legislature's ultimate purpose, the discriminatory scheme is almost always designed either to favor local industry, as such, or to achieve some other goal while exporting a disproportionate share of the burden of attaining it, which is merely a subtler form of local favoritism, *id.*, at 626–628.

On the other hand, in a market served by a municipal facility, a law that favors that single facility over all others is a law that favors the public sector over all private-sector processors, whether local or out of State. Because the favor does not go to local private competitors of out-of-state firms, out-of-state governments will at the least lack a motive to favor their own firms in order to equalize the positions of private competitors. While a preference in favor of the government may incidentally function as local favoritism as well, a more particularized enquiry is necessary before a court can say whether such a law does in fact smack too strongly of economic protectionism. If Local Law 9 is to be struck down, in other words, it must be under that test most readily

---

[11] For the rare occasion when discriminatory laws are the best vehicle for furthering a legitimate state interest, *Maine* v. *Taylor*, 477 U. S. 131 (1986), provides an exception, but we need not address that exception here because this ordinance is not subject to the presumption of unconstitutionality appropriate for protectionist legislation.

identified with *Pike* v. *Bruce Church, Inc.,* 397 U. S. 137 (1970).

## III

We have said that when legislation that does not facially discriminate "comes into conflict with the Commerce Clause's overriding requirement of a national 'common market,' we are confronted with the task of effecting an accommodation of the competing national and local interests." *Hunt* v. *Washington State Apple Advertising Comm'n,* 432 U. S. 333, 350 (1977). Although this analysis of competing interests has sometimes been called a "balancing test," it is not so much an open-ended weighing of an ordinance's pros and cons, as an assessment of whether an ordinance discriminates in practice or otherwise unjustifiably operates to isolate a State's economy from the national common market. If a statute or local ordinance serves a legitimate local interest and does not patently discriminate, "it will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits." *Pike* v. *Bruce Church, Inc., supra,* at 142. The analysis is similar to, but softer around the edges than,[12] the test we employ in cases of overt discrimination. "[T]he question becomes one of degree," and its answer depends on the nature of the burden on interstate commerce, the nature of the local interest, and the availability of alternative methods for advancing the

---

[12] Where discrimination is not patent on the face of a statute, the party challenging its constitutionality has a more difficult task, but appropriately so because the danger posed by such laws is generally smaller. Discrimination that is not patent or purposeful "in effect may be substantially less likely to provoke retaliation by other states . . . . In the words of Justice Holmes, 'even a dog distinguishes between being stumbled over and being kicked.'" Smith, 74 Calif. L. Rev., at 1251 (quoting O. W. Holmes, The Common Law 3 (1881)). See also Regan, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause, 84 Mich. L. Rev. 1091, 1133–1134 (1986).

local interest without hindering the national one.   397 U. S., at 142, 145.

The primary burden Carbone attributes to flow control ordinances such as Local Law 9 is that they "prevent trash from being sent to the most cost-effective disposal facilities, and insulate the designated facility from all price competition."   Brief for Petitioners 32.   In this case, customers must pay $11 per ton more for dumping trash at the Clarkstown transfer station than they would pay at Carbone's facility, although this dollar figure presumably overstates the burden by disguising some differences between the two: according to its state permit, 90 percent of Carbone's waste stream comprises recyclable cardboard, while the Clarkstown facility takes all manner of less valuable waste, which it treats with state-of-the-art environmental technology not employed at Carbone's more rudimentary plant.

Fortunately, the dollar cost of the burden need not be pinpointed, its nature being more significant than its economic extent.   When we look to its nature, it should be clear that the monopolistic character of Local Law 9's effects is not itself suspicious for purposes of the Commerce Clause.   Although the right to compete is a hallmark of the American economy and local monopolies are subject to challenge under the century-old Sherman Act,[13] the bar to monopolies (or, rather, the authority to dismember and penalize them) arises from a statutory, not a constitutional, mandate.   No more than the Fourteenth Amendment, the Commerce Clause "does not enact Mr. Herbert Spencer's Social Statics . . . [or]

---

[13] See 15 U. S. C. §§ 1 and 2.   Indeed, other flow control ordinances have been challenged under the Sherman Act, although without success where municipal defendants have availed themselves of the state action exception to the antitrust laws.   See *Hybud Equipment Corp.* v. *Akron,* 742 F. 2d 949 (CA6 1984); *Central Iowa Refuse Systems, Inc.* v. *Des Moines Metropolitan Solid Waste Agency,* 715 F. 2d 419 (CA8 1983).   That the State of New York's Holland-Gromack Law, 1991 N. Y. Laws, ch. 569 (McKinney), authorizes Clarkstown's flow control ordinance may explain why no Sherman Act claim was made here.

embody a particular economic theory, whether of paternalism . . . or of *laissez faire.*" *Lochner* v. *New York,* 198 U. S. 45, 75 (1905) (Holmes, J., dissenting). The dormant Commerce Clause does not "protec[t] the particular structure or methods of operation in a[ny] . . . market." *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117, 127 (1978). The only right to compete that it protects is the right to compete on terms independent of one's location.

While the monopolistic nature of the burden may be disregarded, any geographically discriminatory elements must be assessed with care. We have already observed that there is no geographically based selection among private firms, and it is clear from the face of the ordinance that nothing hinges on the source of trash that enters Clarkstown or upon the destination of the processed waste that leaves the transfer station. There is, to be sure, an incidental local economic benefit, for the need to process Clarkstown's trash in Clarkstown will create local jobs. But this local boon is mitigated by another feature of the ordinance, in that it finances whatever benefits it confers on the town from the pockets of the very citizens who passed it into law. On the reasonable assumption that no one can avoid producing some trash, every resident of Clarkstown must bear a portion of the burden Local Law 9 imposes to support the municipal monopoly, an uncharacteristic feature of statutes claimed to violate the Commerce Clause.

By way of contrast, most of the local processing statutes we have previously invalidated imposed requirements that made local goods more expensive as they headed into the national market, so that out-of-state economies bore the bulk of any burden. Requiring that Alaskan timber be milled in that State prior to export would add the value of the milling service to the Alaskan economy at the expense of some other State, but would not burden the Alaskans who adopted such a law. Cf. *South-Central Timber Development, Inc.* v. *Wunnicke,* 467 U. S. 82, 92 (1984). Similarly, South Carolinians

would retain the financial benefit of a local processing requirement for shrimp without paying anything more themselves. Cf. *Toomer* v. *Witsell,* 334 U. S., at 403.[14] And in *Philadelphia* v. *New Jersey,* 437 U. S., at 628, the State attempted to export the burden of conserving its scarce landfill space by barring the importation of out-of-state waste. See also *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority,* 476 U. S. 573, 580 (1986) (price reduction for in-state consumers of alcoholic beverages procured at the expense of out-of-state consumers). Courts step in through the dormant Commerce Clause to prevent such exports because legislative action imposing a burden " 'principally upon those without the state . . . is not likely to be subjected to those political restraints which are normally exerted on legislation where it affects adversely some interests within the state.' " *South-Central Timber, supra,* at 92 (quoting *South Carolina Highway Dept.* v. *Barnwell Brothers, Inc.,* 303 U. S. 177, 185, n. 2 (1938)); see also *Southern Pacific Co.* v. *Arizona ex rel. Sullivan,* 325 U. S. 761, 767–768, n. 2 (1945). Here, in contrast, every voter in Clarkstown pays to fund the benefits of flow control, however high the tipping fee is set. Since, indeed, the mandate to use the town facility will only make a difference when the tipping fee raises the cost of using the facility above what the market would otherwise set, the Clarkstown voters are funding their benefit by assessing themselves and paying an economic penalty. Any whiff of economic protectionism is far from obvious.[15]

---

[14] I recognize that the economics differ if a State does not enjoy a significant price advantage over its neighbors and thus cannot pass along the added costs associated with its local processing requirement, but such States are unlikely to adopt local processing requirements for precisely that reason.

[15] This argument does not alone foreclose the possibility of economic protectionism in this case, as the ordinance could burden, in addition to the residents of Clarkstown, out-of-town trash processors who would have sought Clarkstown's business in the absence of flow control. But as we

An examination of the record confirms skepticism that enforcement of the ordinance portends a Commerce Clause violation, for it shows that the burden falls entirely on Clarkstown residents. If the record contained evidence that Clarkstown's ordinance burdened out-of-town providers of garbage sorting and baling services, rather than just the local business that is a party in this case, that fact might be significant. But petitioners have presented no evidence that there are transfer stations outside Clarkstown capable of handling the town's business, and the record is devoid of evidence that such enterprises have lost business as a result of this ordinance. Cf. *Pike* v. *Bruce Church, Inc.*, 397 U. S., at 145 ("The nature of th[e] burden is, constitutionally, more significant than its extent" and the danger to be avoided is that of laws that hoard business for local residents). Similarly, if the record supported an inference that above-market pricing at the Clarkstown transfer station caused less trash to flow to out-of-state landfills and incinerators, that, too, might have constitutional significance. There is, however, no evidence of any disruption in the flow of trash from curbsides in Clarkstown to landfills in Florida and Ohio.[16] Here

will see, the absence of evidence of injury to such processors eliminates that argument here.

[16] In this context, note that the conflict JUSTICE O'CONNOR hypothesizes between multiple flow-control laws is not one that occurs in this case. If Carbone was processing trash from New Jersey, it was making no attempt to return the nonrecycled residue there. And theoretically, Carbone could have complied with both flow control ordinances, as Clarkstown's law required local processing, while New Jersey's required only that any postprocessing residue be returned to the State. But more fundamentally, even if a nondiscriminatory ordinance conflicts with the law of some other jurisdiction, that fact would not, in itself, lead to its invalidation. In the cases JUSTICE O'CONNOR cites, the statutes at issue served no legitimate state interest that weighed against the burden on interstate commerce their conflicts created. See *Bibb* v. *Navajo Freight Lines, Inc.*, 359 U. S. 520, 525 (1959) (mudguards Illinois required on trucks possess no safety advantage but create new hazards); *Southern Pacific Co.* v. *Arizona*

we can confidently say that the only business lost as a result of this ordinance is business lost in Clarkstown, as customers who had used Carbone's facility drift away in response to any higher fees Carbone may have to institute to afford its share of city services; but business lost in Clarkstown as a result of a Clarkstown ordinance is not a burden that offends the Constitution.

This skepticism that protectionism is afoot here is confirmed again when we examine the governmental interests apparently served by the local law. As mentioned already, the State and its municipalities need prompt, sanitary trash processing, which is imperative whether or not the private market sees fit to serve this need at an affordable price and to continue doing so dependably into the future. The state and local governments also have a substantial interest in the flow-control feature to minimize the risk of financing this service, for while there may be an element of exaggeration in the statement that "[r]esource recovery facilities cannot be built unless they are guaranteed a supply of discarded material," H. R. Rep. No. 94-1491, p. 10 (1976), there is no question that a "put or pay" contract of the type Clarkstown signed will be a significant inducement to accept municipal responsibility to guarantee efficiency and sanitation in trash processing. Waste disposal with minimal environmental damage requires serious capital investment, *id.*, at 34, and there are limits on any municipality's ability to incur debt or

ex rel. Sullivan, 325 U. S. 761, 779 (1945) (Arizona statute limiting length of trains "affords at most slight and dubious advantage, if any" with respect to safety). Here, in contrast, we will see that the municipality's interests are substantial and that the alternative means for advancing them are less desirable and potentially as disruptive of interstate commerce. Finally, in any conflict between flow control that reaches only waste within its jurisdiction and flow control that reaches beyond (requiring waste originating locally to be returned after processing elsewhere), it may be the latter that should give way for regulating conduct occuring wholly out of State. See *Brown-Forman Distillers Corp.* v. *New York State Liquor Authority*, 476 U. S. 573, 580-582 (1986).

to finance facilities out of tax revenues. Protection of the public fisc is a legitimate local benefit directly advanced by the ordinance and quite unlike the generalized advantage to local businesses that we have condemned as protectionist in the past. See Regan, 84 Mich. L. Rev., at 1120 ("[R]aising revenue for the state treasury is a federally cognizable benefit"; protectionism is not); cf. *Fort Gratiot Sanitary Landfill, Inc.* v. *Michigan Dept. of Natural Resources*, 504 U. S. 353, 357 (1992) (law protects private, not publicly owned, waste disposal capacity for domestic use); *Philadelphia* v. *New Jersey*, 437 U. S., at 627, n. 6 (expressing no opinion about State's power to favor its own residents in granting access to state-owned resources).[17]

Moreover, flow control offers an additional benefit that could not be gained by financing through a subsidy derived from general tax revenues, in spreading the cost of the facility among all Clarkstown residents who generate trash. The ordinance does, of course, protect taxpayers, including those who already support the transfer station by patronizing it, from ending up with the tab for making provision for large-volume trash producers like Carbone, who would rely on the municipal facility when that was advantageous but opt out whenever the transfer station's price rose above the market price. In proportioning each resident's burden to the amount of trash generated, the ordinance has the added virtue of providing a direct and measurable deterrent to the generation of unnecessary waste in the first place. And in any event it is far from clear that the alternative to flow control (*i. e.*, subsidies from general tax revenues or municipal bonds) would be less disruptive of interstate commerce

---

[17] The Court did strike down California's depression-era ban on the "importation" of indigent laborers despite the State's protestations that the statute protected the public fisc from the strain of additional outlays for poor relief, but the Court stressed the statute's direct effect on immigrants instead of relying on any indirect effects on the public purse. See *Edwards* v. *California*, 314 U. S. 160, 174 (1941).

than flow control, since a subsidized competitor can effectively squelch competition by underbidding it.

There is, in short, no evidence that Local Law 9 causes discrimination against out-of-town processors, because there is no evidence in the record that such processors have lost business as a result of it. Instead, we know only that the ordinance causes the local residents who adopted it to pay more for trash disposal services. But local burdens are not the focus of the dormant Commerce Clause, and this imposition is in any event readily justified by the ordinance's legitimate benefits in reliable and sanitary trash processing.

\*     \*     \*

The Commerce Clause was not passed to save the citizens of Clarkstown from themselves. It should not be wielded to prevent them from attacking their local garbage problems with an ordinance that does not discriminate between local and out-of-town participants in the private market for trash disposal services and that is not protectionist in its purpose or effect. Local Law 9 conveys a privilege on the municipal government alone, the only market participant that bears responsibility for ensuring that adequate trash processing services continue to be available to Clarkstown residents. Because the Court's decision today is neither compelled by our local processing cases nor consistent with this Court's reason for inferring a dormant or negative aspect to the Commerce Clause in the first place, I respectfully dissent.