**A.G.G. ENTERPRISES, INC.,**
an Oregon corporation,
Plaintiff,

v.

**WASHINGTON COUNTY, OREGON,**
Clackamas County, Oregon, and City of Gresham, Oregon. Defendants.

and

Waste Management Of Oregon, Inc., Oregon Refuse and Recycling Association, Keller Drop Box, Inc., John P. Lehl Co., Oak Grove Disposal Co., and City of Milwaukie, Oregon, Defendant–Intervenors.

Civil No. 00–1418–KI.

United States District Court,
D. Oregon.

May 29, 2001.

Lawrence R. Davidson, Portland, OR, for Plaintiff.

George D. McDowell, Washington County Counsel, Hillsboro, OR, David W. Anderson, Clackamas County Courthouse, Oregon City, OR, for Defendants.

Barnes H. Ellis, Stephen A. Redshaw, Stoel Rives LLP, Portland, OR, G. Kevin Kiely, Margaret B. Stern, Cale Huston Benedict Haagensen & Lloyd, Portland, OR, for Intervenors.

## FINDINGS AND CONCLUSIONS

KING, District Judge.

"Garbage collection is a unique business that does not fit neatly into preestablished categories." *Admiral Disposal Co. v. Department of Revenue*, 302 Ill.App.3d 256, 235 Ill.Dec. 858, 706 N.E.2d 118 (Ill.App. 1999).

Plaintiff A.G.G. Enterprises, Inc., ("AGG") brought this action against defendants Washington County, Oregon, and Clackamas County, Oregon, (the "Counties") seeking to have Chapter 8.09 of the Washington County Code on Solid Waste Control and Chapter 10.05 of the Clackamas County Code on Solid Waste Control declared unenforceable for three reasons: (1) preemption by the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"); (2) violation of the Commerce Clause; and (3) violation of the Equal Protection Clause of the federal Constitution and the Equal Privileges Clause of the Oregon Constitution.

AGG filed a similar case against Washington County and the City of Beaverton, CV99–1097 ("AGG–I"), in which I held a court trial in March 2000. AGG–I concerned mixed solid waste ("MSW") collected by AGG in large drop boxes holding 10 to 40 cubic yards. I concluded that the FAAAA preempted the ordinances at issue in AGG–I and enjoined the AGG–I defendants from enforcing their ordinances against AGG in certain situations. In response, the Counties amended their ordinances to account for the injunction. AGG–I is still on appeal.

After I entered the injunction, AGG began to service customers that wanted to dispose of smaller amounts of MSW in two to six yard containers. A large AGG packer truck picks up containers from multiple customers on predetermined routes and takes the MSW to the material recovery facility ("MRF") for further processing. Commingling of multiple customers' MSW is prohibited by the amended ordinances. The current action ("AGG–II") only concerns MSW in the smaller containers which is commingled in the AGG packer truck.

I held a two-day court trial in this action. Having considered the arguments of counsel, testimony of witnesses, and other evidence introduced by the parties, I make the following findings of fact and conclusions of law. I conclude that AGG does not prevail under any of its theories.

## FACTS

AGG is in the business of picking up MSW and source-separated recyclable materials from its customers and hauling the material to a MRF. Its advertisements state that AGG specializes in refuse removal, disposal, and recycling. The company typically contracts with businesses and construction companies to provide drop boxes or smaller containers at their sites. Its customers are also known as generators. AGG has the authority to transport property in interstate commerce under a Federal Highway Administration permit and an Oregon Department of Transportation motor carrier permit.

AGG is headquartered in Multnomah County, which only regulates this type of business to the extent that a license is required of the hauler. The number of haulers is not limited and they are not confined to particular geographic areas. The Counties and intervenor City of Milwaukie (collectively, the "Governments") were divided into geographic areas and exclusive franchises were assigned to haulers years ago. Some franchises have been transferred over the years, but the franchises have never been rebid. AGG wishes to expand operations into the Governments but it does not have and cannot obtain a franchise for an area within them.

Several AGG packer truck customers testified. Many performed source-separated recycling also, either through AGG or on their own. The customers switched to AGG from their franchised haulers because of cheaper rates and better service. The customers routinely put the waste from their businesses into the containers, including paper, cardboard, and metal. Although these could be source-separated, some of the businesses do not generate enough volume to bother. They also put the waste generated by having employees, and possibly customers, in a building during the day, including floor sweepings, trash from lunch rooms, and trash from bathrooms.

AGG services the packer truck customers on two regular routes for dry loads. Route # 204 services from as few as seven customers on Tuesday and Wednesday to as many as 31 customers on Monday. The customer list includes businesses which would be expected to generate a lot of putrescible waste, such as bowling alleys which allow customers to bring food in from other businesses. Others, such as appliance stores, would be expected to have much less.

A few weeks before trial, AGG changed its standard customer contract. Both the old and new contracts state that AGG has the exclusive right to collect and dispose of all of the customer's waste materials and recyclables. The previous version stated that AGG acquires title to waste materials, other than hazardous, toxic, or radioactive waste, once they are loaded onto its trucks.

The new contract states:

> Contractor shall not acquire title to either the waste or recyclable materials nor title to any hazardous, toxic or radioactive waste or substance when these materials are loaded on to contractor's vehicles and/or equipment . . . .

AGG does not always enforce the exclusivity provision and has required some customers to use a franchised hauler to pick up putrescible waste. It has also stopped hauling for several customers because the level of putrescible waste was too high.

AGG brings its dry loads of MSW to East County Recycling ("ECR"), a MRF, and drops the load on the ground in a sorting area. ECR employees sort, separate, and remove the recyclable material, primarily wood, carpet, metal, drywall, cardboard, glass, and concrete. ECR then transports the residual waste to a Wasco County landfill for final disposal. ECR's

permit is limited to accepting dry MSW. All parties acknowledge that some putrescible waste gets into most dry loads of MSW. Metro and ECR are currently enforcing a maximum of 5% or 300 pounds of putrescible waste in any load.

When possible, the AGG driver "stabs" the containers and dumps them into the packer truck without leaving the driver's seat of the truck. When this happens, the driver does not have an opportunity to scan for obvious putrescible waste in the container prior to pickup. In this case, the putrescible waste is not noticed until the load is dumped at ECR. AGG employees maintain that they have a good, but not perfect, chance to determine which customer put unacceptable material in its container. They maintain that the MSW gets packed into the AGG truck in first-in-first-out order. Their knowledge of the order of customers on the routes, combined with their knowledge of the types of materials the different businesses typically put into their containers, can allow them to trace problems back to the source. Other haulers dispute this, stating that the MSW gets mixed together as it is packed into the truck.

AGG is ECR's biggest customer, providing about 30–40% of ECR's business. AGG has been bringing packer truck loads of MSW to ECR for three years and ECR has not noticed a higher amount of putrescible waste in the packer trucks. It considers the packer trucks to have loads with high concentrations of recyclables, ranging from 30–80% and averaging 50%. ECR's facility recovery rate for the six months ending in December 2000 was 50.3% as reported by Metro. This time period includes AGG's expanded use of the packer trucks in the Governments' jurisdictions.

Many of the transfer stations and landfills in the Portland metropolitan area are also doing some recovery of recyclables. Metro reports rates ranging from 25.4% to 48.9% for other facilities in the six months ending in December 2000, but these facilities process a volume that is, at most, a quarter of that processed by ECR.[1]

ECR sells recycled materials to numerous vendors for further processing. There is disputed testimony on whether various materials can be sold by ECR, including paper covered with dry paint from auto body shops and paper cups and plates with the remains of food. I consider ECR to be in the best position to know. It testified that it routinely sells these articles without complaint. In any case, I do not doubt the recovery figures reported by Metro.

ECR rejects a putrescible load from a hauler or individual every day. If the load is dumped before the large quantity of putrescible waste is noticed, the load will either be reloaded into the hauler's truck or drop box and returned to the hauler, or taken to Metro with the hauler responsible for the tipping fee. On January 11, 2001, Metro sent ECR a Notice of Non–Compliance for accepting an AGG packer truck with putrescible waste commingled throughout the load, for a total of 1800 pounds, or 11.7% of the load. ECR testified that it only received the load, rather than rejecting it, because it was working with Metro on a program to determine the amount of putrescible waste brought to the facility so that a quantifiable measure could be stated in the regulation.

AGG charges its customers a set monthly fee for a certain number of scheduled pickups, no matter how much weight is in the container. ECR charges AGG $62.50 per ton. ECR keeps the money it makes from selling the recyclables it reclaims from the MSW loads. ECR pays $12.50 per ton to haul the residual waste to Was-

1. As shown by the relative size of the Metro fee credits paid.

co County and $22 per ton to tip the residual waste at the Wasco County landfill. ECR's founder testified that the company would lose money if it acted as a strict transfer station, without removing any recyclables, because it would lose both the money from the sale of the recyclables and the Metro recovery fee credits.

The ordinances make it unlawful for anyone to collect, store, transport or dispose of any waste [2] or solid waste in their areas of jurisdiction without receiving a certificate or franchise [3], or to conduct the activities in service areas not covered by the certificate. WCC 8.04.120; CCC 10.03.140; MC 1752 §§ 2(i), 17. Civil penalties can be assessed for violations. The ordinances passed by the Governments in response to my earlier injunction require registration and tonnage fees for haulers working within the exception carved out by the injunction. Registrants may transport MSW from single generators but may not combine loads from multiple generators into a single truck. WCC 8.09.045–.050; CCC 10.05.030; MC 13.26.030.

The State of Oregon has a goal of recovering at least fifty percent from the general solid waste stream by January 1, 2000. ORS 459A.010(1). The franchise process and the ordinances are the Governments' way of supporting that goal by providing service at a reasonable cost to all residential and commercial customers.

The Governments prefer source separating of recyclables to commingling of MSW because the recovery rates are nearly 100% and there is little if any contamination. They prefer a franchise system because it ensures that all customers, even those remotely located, can get service at a

uniform rate, illegal dumping is reduced, and traffic is lowered.

## DISCUSSION

### I. Preemption

Under Article VI of the Constitution, the laws of the United States are the supreme law of the land and any conflicting state law is without effect. *Southern Pacific v. Oregon PUC,* 9 F.3d 807, 810 (9th Cir.1993). Congress may preempt state laws by explicitly defining the extent to which preemption occurs. *Id.* When determining if a state statute is preempted by federal law, the "sole task is to ascertain the intent of Congress." *California Federal Sav. and Loan Ass'n v. Guerra,* 479 U.S. 272, 280, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987).

Congress acted to deregulate the motor carrier industry when it enacted the Federal Aviation Administration Authorization Act of 1994 ("FAAAA"). The Act contains a preemption provision which AGG contends applies to it:

> (1) General rule.... [A] State, political subdivision of a State, or political authority of 2 or more States may not enact or enforce a law ... related to a price, route, or service of any motor carrier ... or any motor private carrier, broker, or freight forwarder with respect to the transportation of property.

49 U.S.C. § 14501(c). The difficulty lies in the fact that the term "property" is not defined in the Interstate Commerce Act. Defendants [4] also contend that the Act does not apply because AGG is neither a motor carrier nor a motor private carrier.

---

**2.** Waste is defined as "material that is no longer useable or wanted by the source of the material, which material is to be utilized or disposed by another." "Utilized" includes recycling. WCC 8.04.020(Q).

**3.** The codes use slightly different terminology although the idea is the same.

**4.** I will refer to both defendants and intervenors as "defendants" unless there is a reason to differentiate.

Defendants contend that AGG is not a motor carrier because AGG takes title to the refuse once it is loaded into the AGG truck and is thus transporting its own property. They also contend that AGG's primary business is disposal and recycling, not transportation. If accepted, these facts indicate that AGG could be a motor private carrier. Defendants contend that this is not the case because AGG does not transport the loads at issue in interstate commerce.

Motor carrier is defined as "a person providing motor vehicle transportation for compensation." 49 U.S.C. § 13102(12). A motor private carrier is an owner, lessee, or bailee transporting property interstate by motor vehicle, when the property "is being transported for sale, lease, rent, or bailment or to further a commercial enterprise." 49 U.S.C. § 13102(13).

■ Case law teaches that motor carriers provide "transportation for compensation" only when they carry property that does not belong to them. If the motor carrier owns the property, they might qualify as a motor private carrier. The primary business test is used to distinguish between the two. It determines if the transportation is within the scope and in the furtherance of a primary business enterprise other than transportation. *Nuclear Diagnostic Laboratories, Inc.,* 131 M.C.C. 578, 581 (1979). The factors include: (1) ownership of the property transported; (2) extent of the use of storage facilities; (3) financial risk involved; (4) separate transportation charge; (5) holding out to perform transportation for others; (6) nature of any advertising; (7) extent of investment in transportation facilities and equipment; (8) performance of any real service other than transportation; (9) use of equipment on a backhaul basis; (10) use of for-hire carriers; (11) economic purpose of the operation.

Several cases have applied the test to companies transporting refuse. In *Nuclear Diagnostic,* the carrier transported radioactive waste to disposal facilities. The Commission stated without analysis that the carrier obtained title to the waste when it is picked up. There is no discussion of whether the contract between the parties had a term to this effect. *Id.* at 582. The carrier also sold containers and other materials to its customers, conducted monitoring tests on the loads of radioactive waste, sealed containers, stored loaded containers, and consolidated containers before transporting to the final disposal sites. *Id.* at 583. The Commission concluded that the carrier was a private carrier which performed transportation as an integral part of its complete waste disposal service. *Id.* at 585.

In *Joray Trucking Corp.,* 99 M.C.C. 109 (1965), the Commission stated that the rock and debris generated from excavations and building demolitions would appear to be owned by the carrier who was transporting the debris on its own behalf in the performance of a disposal service. *Id.* at 110.

This issue has also arisen when carriers dispute excise taxes levied against their equipment. In *Admiral Disposal Co. v. Department of Revenue,* 302 Ill.App.3d 256, 235 Ill.Dec. 858, 706 N.E.2d 118 (Ill. App.), *aff'd,* 183 Ill.2d 565, 238 Ill.Dec. 712, 712 N.E.2d 816 (1999), Admiral provided dumpsters and hauled refuse to the landfill from businesses and multi-family homes on a regular schedule. Because private carriers were not entitled to a tax exemption, the court applied the primary business test and concluded that Admiral was a private carrier whose business was refuse collection. It determined that the ownership of the refuse was not clear, noting that it did not necessarily follow that an ownership interest was either retained or extin-

guished when the refuse was collected. Although the contracts allowed for rate increases to reflect changes in landfill rates or distances traveled, the company had never relied on the provision. The court also noted that customers were not trying to safely transport a valuable good to a specific destination, they just wanted their dumpsters emptied regularly. *Id.* at 122.

In *Meyer Waste Systems, Inc. v. Indiana Department of State Revenue,* 741 N.E.2d 1 (Ind. Tax Ct.2000), Meyer transported refuse from residential and business customers and did some recycling of an unspecified nature. The court held that, absent an agreement to the contrary, the hauler acquired the incidents of ownership, namely, possession, the rights of use and enjoyment, and the right of disposal, when the hauler picks up the refuse from the generator. Because there was no contract, the court held that the hauler was the owner of the garbage. *Id.* at 5–8.

The main points of contention in AGG–II under the primary business test are: (1) who owns the MSW once collected; and (2) the nature of the business in which this division of AGG is engaged. Several factors support the argument that AGG is a motor carrier. Under the terms of its new standard contract[5], AGG acquires title to neither the waste nor recyclable materials. The contract language is significant under *Meyer.* Although AGG is responsible to ECR for the cost of transporting rejected putrescibles to a landfill, there is evidence that AGG tries to trace the putrescibles back to the customer to recoup its expenses. If AGG ever owns the refuse, it is for a few hours at most, until delivery at ECR. Although we do not have specifics on the size of the investment, AGG owns both the packer trucks and the containers used on these routes. There is no evidence of

any other sizeable investment except the trucks and large drop boxes used in AGG–I. Any waste disposal business that AGG engages in apart from hauling is much less extensive than the waste disposal business discussed in *Nuclear Diagnostics.*

Several other factors supporting a finding that AGG is not a motor carrier, but may be a private motor carrier, include the following. *Joray* and *Admiral* support defendants' contention that AGG is not a motor carrier. With the smaller containers used in AGG–II, AGG does not charge a separate transportation fee. Its advertisements call the company a specialist in refuse removal, disposal, and recycling, not in transportation. AGG advertisements state that it will do a waste audit and provide recycling and waste consulting services. There is no evidence, however, that this consists of anything except inquiry during a sales call to determine what recyclable material the customer routinely discards and consequently, which AGG containers would be appropriate.

AGG does not store anything, but it does consolidate partial loads from different customers in the packer truck before taking the full truck to ECR. AGG's situation is not distinguishable from *Admiral,* which was held to be a private carrier rather than a carrier for hire. AGG has possession of the garbage once it is picked up from the customer and it controls where to take the load. Some customers did not even know that ECR was the next destination, much less specify it. Although AGG claims to be able to trace back some putrescibles to the particular customer, it cannot do this every time.

The critical factor is the type of the business. I discount the ownership issue because I see no reason why ownership,

---

**5.** There is no evidence that AGG could not get all of its customers to rapidly execute a new version of the contract so I will base the analysis on it.

and the risks it entails, cannot be a matter of contract between the hauler and customer.

There are several differences between the packer division of AGG at issue here and the drop box division at issue in AGG–I. In AGG–I, AGG charged its customers a hauling fee and passed the ECR tipping fee, based on the weight of the load, through to the customer. AGG picked up the loads on an on-call basis, rather than on a regular route, and charged the hauling fee per call rather than charging a set fee per month. The nature of the customers and their typical waste differs. With the size of the drop boxes in AGG–I, the percentage of putrescible waste in a load would be much smaller.

The House Conference Report on the FAAAA states:

> The conferees further clarify that the motor carrier preemption provision does not preempt State regulation of garbage and refuse collectors. The managers have been informed by the Department of Transportation that under ICC case law, garbage and refuse are not considered "property". Thus garbage collectors are not considered "motor carriers of property" and are thus unaffected by this provision.

H.R. Conf. Rep. No. 103–677, at 208 (1994), *reprinted in* 1994 U.S.C.C.A.N. 1715.

■ Although I concluded in AGG–I that the drop box division was a motor carrier, defendants have litigated the issue more forcefully in AGG–II and have provided additional case law which was instructive. The differences between AGG–I and AGG–II cause me to conclude that the packer truck division of AGG has a primary business other than transportation, namely a refuse disposal and recycling business. Consequently, the packer division of AGG is not a motor carrier.

■ There is evidence that AGG hauls source-separated recyclables interstate, but that part of its business is separate from the packer truck division at issue in AGG–II. Thus, under the definition provided by 49 U.S.C. § 13102(13), I conclude that the AGG packer truck division is also not a motor private carrier. The FAAAA preemption clause only applies to motor carriers and motor private carriers. Accordingly, the FAAAA does not preempt the ordinances when applied to AGG's packer truck division.

## II. *Dormant Commerce Clause*

■ AGG contends that the ordinances are unconstitutional barriers to interstate commerce. Alternatively, AGG contends that the indirect burden on interstate commerce is not balanced by the local benefits provided by the ordinances. According to AGG, the indirect burden on interstate commerce is the difference in recycling rates between ECR and the landfills or transfer stations that the franchised haulers utilize.

■ Two types of state regulations might burden interstate commerce: (1) those that directly burden interstate commerce or that discriminate against out-of-state interests; and (2) those that burden interstate transactions only incidentally. Regulations in the first category are unconstitutional unless the state can demonstrate that a legitimate local interest unrelated to economic protection is served by the regulation and no less discriminatory alternative exists. Regulations in the second category are analyzed under the *Pike* balancing test, *Pike v. Bruce Church*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). *Kleenwell Biohazard Waste v. Nelson*, 48 F.3d 391, 395 (9th Cir.), *cert. denied*, 515 U.S. 1143, 115 S.Ct. 2580, 132 L.Ed.2d 830 (1995).

 If the primary purpose of the regulation is to regulate interstate commerce or if it favors in-state interests over out-of-state interests, it is generally in the first category. Regulations in the second category are those designed to address a legitimate local concern and only incidentally affect interstate commerce. The party challenging the validity of the regulation has the burden of demonstrating that it has a discriminatory purpose or effect. *Id.* at 398 and n. 8.

In *Kleenwell*, the challenged regulation required all solid waste collection companies within the state to obtain a certificate of public convenience before collecting waste. The plaintiff solid waste collector specialized in medical waste. The court concluded the regulation at issue fell into the second category because it addressed a legitimate local concern, the safe disposal of solid waste, and it allowed both in-state and out-of-state firms to obtain the certificate. *Id.* at 398. After applying the *Pike* test, the court upheld the regulatory scheme [6]. *Id.* at 399.

In another solid waste case, *C & A Carbone, Inc. v. Town of Clarkstown, New York*, 511 U.S. 383, 114 S.Ct. 1677, 128 L.Ed.2d 399 (1994), the Supreme Court determined that the challenged ordinance directly regulated interstate commerce and applied the test from the first group above. The ordinance was a flow control ordinance which required all solid waste in the town, whether generated there or brought there for processing, to be processed at a designated transfer station before leaving the town. The Court determined that the ordinance discriminates against interstate commerce because it drove up costs for out-of-state interests who disposed of their waste with haulers located in the town and it deprived out-of-state businesses access to a local market.

"The essential vice in laws of this sort is that they bar the import of the processing service.... [T]he offending laws hoard a local resource [here, solid waste]... for the benefit of local business that treat it." *Id.* at 392, 114 S.Ct. 1677. The court struck down the law.

 The collection and disposal of solid waste is considered primarily a function of state and local governments. *Kleenwell*, 48 F.3d at 398. The Supreme Court has rejected the contention that any regulation affecting particular companies engaged in interstate commerce necessarily represents a direct burden. *Id.* at 397, citing *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978). The ordinances before me do not have a primary purpose of regulating interstate commerce. Out-of-state interests are not discriminated against. It is true that the haulers in place when the ordinances were enacted were given an advantage in retaining their territories. Those haulers, however, could have been out-of-state firms. Although no one is getting a new territory and territories have not been reassigned except through sale by the original hauler, both in-state and out-of-state haulers can compete for the purchase of an existing franchise. Currently, Waste Management, a national corporation, owns several of the certificates. Accordingly, I conclude that the ordinances burden interstate commerce only indirectly and the *Pike* test should be used to analyze their constitutionality.

The *Pike* balancing test recognizes that incidental burdens on interstate commerce may be unavoidable when a State legislates to safeguard the health and safety of its people. Accordingly, under the *Pike* test, "[w]here the statute

---

**6.** The plaintiff only challenged the state's ability to impose a certification requirement and did not challenge the state's refusal to grant it a certificate.

regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, *it will be upheld unless the burden imposed upon such commerce is clearly excessive in relation to the putative local benefits.*"

*Kleenwell,* 48 F.3d at 399 (internal quotation and citation omitted, emphasis in the original, quoting *Pike,* 397 U.S. at 142, 90 S.Ct. 844). The party challenging the regulation must establish that the burden on interstate commerce clearly outweighs the local benefits arising from the regulation. *Id.*

The local interest being protected by the ordinances is to provide safe, affordable and efficient waste disposal for all residential and commercial customers within the Governments' confines. Additionally, the Governments wish to reduce truck traffic and its associated pollution, noise, and use of energy. These are legitimate areas of local concern and implicate public health and safety issues.

AGG relies on *U & I Sanitation,* 205 F.3d 1063 (8th Cir.2000), which analyzed a flow control solid waste ordinance requiring all garbage collected within the city limits, except garbage destined for out-of-state disposal, to be processed at the city-owned transfer station that provided no recycling. The MRF used by U & I Sanitation recycled 16% of the solid waste received, compared to a 2 to 3% recycling rate in a voluntary community-based program. Under the *Pike* test, the court concluded that the ordinance violated the Commerce Clause because of its effect in removing recyclables from the manufacturing stream. Although the effect of one city's ordinance might be minimal, the court considered the effect if all cities enacted similar ordinances, consequently substantially diminishing the market in recyclables. *Id.* at 1069.

The ordinances before me are not flow control ordinances. The incidental burden that I find in them is that new companies, such as AGG, have a difficult, if not impossible, time entering the market within the Governments. Although franchises have been purchased, this is not a common event. The new companies, particularly AGG, might be more willing to take the MSW loads to a MRF rather than to a landfill or transfer station. This would increase the available recyclables and have an incremental effect on interstate commerce. The market is changing, however, and the transfer stations are starting to recycle more of the MSW, although they do not compare with the rates and volumes achieved by ECR. There is nothing in the ordinances, however, which prevents the franchisees from utilizing a MRF such as ECR. This is the distinguishing factor between AGG II and *U & I Sanitation,* in which the haulers were prohibited from taking the MSW to a MRF.

*U & I Sanitation* also considers less burdensome alternatives in the balance. *Id.* at 1070–71. Portland and Multnomah County do not regulate commercial hauling by dividing the area into exclusive franchises. Haulers must be licensed but are not limited geographically if the basic requirements are met. AGG contends that this method should be used in defendants' geographic areas and that tonnage fees can be used to generate income.

Certainly this is a possible alternative. One of defendants' concerns, however, was to provide affordable service to isolated rural customers. No evidence was presented comparing the population densities of the Counties. Portland is densely populated and would not present that issue. I realize that AGG has offered to service any customer at the franchise rate. Other carriers who might be waiting to enter the business without a franchise have not

made that promise, however, and I am also wary of the effect on similar ordinances in areas where AGG does not operate. AGG's alternative also does not address the problem of increased traffic and noise caused by trucks from multiple haulers coming to a street on multiple days a week.

After balancing the local public interest and the effects on interstate commerce, I conclude that the burden imposed upon interstate commerce is not clearly excessive in relation to the local benefits. Accordingly, I find that the ordinances do not violate the Commerce Clause.

### III. *Equal Protection Clause*

 AGG contends that the ordinances violate the Equal Protection Clause of the 14th Amendment of the federal Constitution and Article I, § 20 of the Oregon Constitution, the Equal Privileges Clause [7]. In its trial memorandum, AGG discusses selective enforcement of the ordinances. After reading all of AGG's briefs, I believe that is actually contending that there is no rational reason for the ordinances to treat franchised haulers differently from non-franchised haulers, such as AGG.

 If a government action does not involve a suspect classification or implicate a fundamental right, it will survive constitutional scrutiny for an equal protection violation as long as it bears a rational relation to a legitimate state interest. *Patel v. Penman*, 103 F.3d 868, 875 (9th Cir.1996) (enforcement of the building code against downtown motel which was the site of much criminal activity), *cert. denied*, 520 U.S. 1240, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997).

 Article I, § 20 of the Oregon Constitution is an equal privileges and immunities clause that scrutinizes benefits in the form of privileges and immunities given to a particular class, rather than discrimination against a particular class. If the distinction is based on a personal characteristic that is not immutable, the court reviews the classification for whether the legislature had a rational basis for making the distinction. *In the Matter of the Marriage of Crocker*, 332 Or. 42, 22 P.3d 759, 764–65 (2001). Franchises occasionally change hands so the characteristic is not immutable. Accordingly, the analysis under the federal and state constitutions is the same.

AGG notes that both it and the franchised haulers: (1) provide containers and dumpsters to customers; (2) collect, consolidate, and dispose of the loads; (3) charge a set fee; (4) take the MSW to transfer stations, MRFs, or landfills; and (5) recycle a portion of the MSW collected. Thus, AGG contends that there is no rational basis to require AGG to refrain from commingling MSW from multiple customers in a single load while franchised haulers can consolidate the MSW in their packer trucks.

The Governments provided evidence of several reasons for implementing an exclusive franchise system, namely to provide service at a reasonable price to all customers, including remote ones, to reduce of illegal dumping, and to reduce traffic and noise. These are legitimate areas of local concern and implicate important public health and safety issues. Moreover, hauling is limited to franchised haulers because their rates are set by the governments. Franchised haulers cannot compete against nonfranchised haulers who can undercut the price because they are regulated to a lesser extent I conclude that the ordinances setting up the exclusive franchises have a rational relation to further

---

**7.** No law shall be passed granting to any citizen or class of citizens privileges, or immunities, which, upon the same terms, shall not equally belong to all citizens.

legitimate state interests. Consequently, there is no Equal Protection or Equal Privileges violation.

## CONCLUSION

Plaintiff's motion for a preliminary injunction (# 5) is denied.

AGG has failed to prove that the ordinances at issue are preempted by the FAAAA or violate the Commerce Clause, the Equal Protection Clause, or the Equal Privileges Clause of the Oregon Constitution. Thus, it does not prevail in this action. I do note, however, that after two court trials and a mountain of briefing, I have seen no evidence or argument explaining why the various government entities do not put the franchises up for bid on a periodic basis. This action would preserve the interests protected by the franchise system but would increase the likelihood of better customer service and increased recycling of the waste, goals which benefit the communities.