United States Court of Appeals
Fifth Circuit

**F I L E D**

**October 29, 2004**

Charles R. Fulbruge III
Clerk

REVISED NOVEMBER 17, 2004

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 03-60470
_____

NATIONAL SOLID WASTE MANAGEMENT
ASSOCIATION; ET AL,

                                        Plaintiffs,


NATIONAL SOLID WASTE MANAGEMENT
ASSOCIATION; BFI WASTE SYSTEMS,
BFI WASTE SYSTEMS OF MISSISSIPPI
LLC; WASTE MANAGEMENT OF MISSISSIPPI INC.,

                                        Plaintiffs-Appellees,

        versus


PINE BELT REGIONAL SOLID WASTE
MANAGEMENT AUTHORITY AND ITS BOARD
OF COMMISSIONERS; COVINGTON COUNTY;
JONES COUNTY; PERRY COUNTY; CITY OF
PETAL; CITY OF LAUREL; CITY OF
HATTIESBURG, MISSISSIPPI;

                                        Defendants-Appellants,


MIKE MOORE,

                                        Intervenor-Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Mississippi
_____

Before GARWOOD, WIENER and DeMOSS, Circuit Judges.

GARWOOD, Circuit Judge:

The Mississippi cities and counties that belong to the Pine Belt Regional Solid Waste Management Authority (the Authority) enacted solid waste flow control ordinances requiring that all solid waste collected within those cities and counties be disposed of at facilities owned by the Authority.  Plaintiffs-appellees, National Solid Wastes Management Association (NSWMA), BFI Waste Systems of Mississippi, LLC (BFI), and Waste Management of Mississippi, Inc. (Waste Management) (collectively, plaintiffs), filed this suit against defendants-appellants, the Authority and its member cities and counties, claiming that the flow control ordinances violated the dormant Commerce Clause.  Defendants-appellants now timely appeal the judgment, rendered after a bench trial, declaring the flow control ordinance invalid under the dormant Commerce Clause and enjoining their enforcement.  We dismiss plaintiffs' complaint in part for want of standing and with respect to the remainder we reverse and render judgment for defendants-appellants.

## Facts and Proceedings Below

In 1989 and 1990, several cities and counties in South Mississippi developed a master plan for the management of the solid waste in the region.  The goal of the plan was to develop an environmentally-sensitive and cost-effective program for the

2

disposal of the region's solid waste.  Among other things, the master plan recommended the creation of a regional solid waste management authority and the construction of a regional landfill. In 1992, the Authority was formed and the plan was adopted.  At that time, the Authority was made up of five counties (Covington, Jones, Perry, Forrest, and Lamar) and three cities (Petal, Laurel, and Hattiesburg) in Mississippi (collectively, the Members).  By the time this suit was filed, Forrest and Lamar Counties had withdrawn from the Authority.

In 1992, the Authority issued a request for proposals (RFP) to interested parties, including plaintiffs BFI and Waste Management, regarding the regional landfill.  Proposals were to be given for two options: 1) to own, design, permit, build, and operate the landfill for thirty years or 2) to equip and operate the landfill for seven years, with the Authority building and owning the landfill.  The RFP included an estimated volume of disposable solid waste that would be generated in the geographic area comprised by the Members[1] and a statement that "[u]pon request, the Authority

---

[1] The 1992 RFP estimated the annual volume of disposable waste in the Region to be 153,000 tons.  That estimate, however, was derived before Forrest and Lamar Counties withdrew from the Authority.  After these two counties withdrew (which was prior to July 2002), the projected volume of waste for the Authority's Region would have been about 129,000–130,000 tons per year.
When creating the master plan and issuing the RFP, the Authority contemplated, at least implicitly, that all solid waste generated within the Region would be disposed of at the landfill that was the subject of the RFP.  The Authority's landfill is, and always has been, the only "Subtitle D" landfill within the Region.  A Subtitle D landfill is one that is compliant with federal regulations, issued pursuant to Subtitle D of the Resource Conservation and Recovery Act of 1976 (RCRA), 42 U.S.C. § 6941, *et. seq.*, setting the criteria for sanitary landfills.

will require each [Member] . . . to adopt and enforce a flow control ordinance in order to assure that the entirety of the . . . waste stream generated within the [geographic area comprised by the Members] will be managed and disposed of at the [Authority's landfill]." Five proposals were received, including from BFI and Waste Management. Enviro, a company headquartered in Laurel, Mississippi, submitted the lowest bid for Option 2, but did not submit a bid for Option 1. The Authority analyzed the bids, decided to own the landfill, and began implementation discussions with Enviro prior to actual contract negotiations.

In 1996, the Authority issued revenue bonds to finance the construction of the landfill and three transfer stations.[2] Also in 1996, Enviro signed a contract with the Authority to operate the Authority's landfill,[3] located in Perry County and completed in 1997, and transfer stations. The initial term of the contract was for the life of the first landfill cell or seven years, whichever was less, and was to be automatically extended for one-year terms so long as both parties mutually agreed. In 2000, the Authority refinanced the 1996 bonds and issued additional bonds to finance the construction of a second cell at the landfill.

---

[2] Waste collecting trucks often unload waste locally at a transfer station until the waste is transported to a landfill for final disposal.

[3] Enviro provides the labor, management, supplies, equipment, and insurance for the landfill and operates the scales and performs all maintenance at the landfill.

4

The Authority generates revenue by collecting fees for the disposal of waste at its landfill and transfer stations. Thus the Authority's generation of revenue is based on the amount of garbage that it receives at its facilities. To the extent that the Authority is unable to generate sufficient income to meet its debt payments, the Members are obligated to make up the shortfall.

From the time the landfill opened, the volume of refuse that passed through and to the Authority's facilities was significantly less than the total amount of potential waste generated in the area comprised by its Members. Although the Authority's issuance of bonds was based on a projected volume of 140,000 tons per year, in fiscal year 1998 the landfill's volume had reached only 105,305 tons and in fiscal year 1999, the volume dropped to 96,032 tons. In 1999, in an attempt to increase its trash collection, and therefore its revenue generation, the Authority extended the service area of the landfill to include a total of 22 counties, which allowed the Authority to receive waste at its landfill from the additional counties which were not Members.[4] While the volume of trash deposited at the landfill increased with the expanded service area, it reached a high of only 129,017 tons in fiscal year

---

[4] According to its contract with the Authority, Enviro was obligated to bring to the Authority's landfill all the waste it collected within a 75-mile radius of the landfill. The area comprised by the 22 counties roughly corresponds to this 75-mile radius. *The flow control ordinances*, however, apply *only* to the three counties and three cities that are Members of the Authority. When the Authority first created its plan for the landfill, the service area included only the five original member counties (Covington, Jones, Perry, Forrest, and Lamar); the expanded service area added an additional 17 counties.

2000, with the tonnage decreasing thereafter (to 108,625 in 2001 and to 95,205 in 2002).

Due to an insufficient flow of rubbish through and to its facilities, the Authority realized that, at the current volume of waste, it would not be able to make its July 1, 2004 bond payment. Believing that its facilities needed more garbage to remain viable, the Authority adopted a resolution on July 10, 2002, directing its Members to adopt flow control ordinances requiring that all municipal solid waste generated within the then Member counties (Covington, Jones and Perry) and cities (Petral, Laurel and Hattiesburg) respectively [collectively, the Region] be transported to its landfill or one of its transfer stations.[5] Each Member enacted identical ordinances, each applicable only within the geographic area of the particular enacting Member, with September 1, 2002, as the effective date.[6] Each ordinance provided that noncompliance therewith would constitute a misdemeanor.

Following the enactment of the ordinances, plaintiffs on August 29, 2002 filed this suit against the Authority and its Members, seeking declaratory, injunctive, and monetary relief under

---

[5] According to testimony at trial, the amount of trash currently leaving the Region is between 50,000 to 70,0000 tons per year; if this trash were directed to the Authority's landfill, the tonnage disposed of at the landfill would likely be over 140,000, roughly the amount needed to meet the Authority's debt obligations.

[6] The flow control ordinances were subsequently reenacted in September, October, and November of 2002.

42 U.S.C. § 1983.[7] Plaintiffs BFI and Waste Management collect, process, and dispose of commercial and residential solid waste and currently ship the trash they collect within the Region to landfills and transfer stations that they either own and operate or that are owned and operated by affiliated companies. At the time of the suit, solid waste collected by BFI and Waste Management within the Region was and had been eventually transported to landfills outside of the Region, but within Mississippi; none of such waste was (or had been) transported outside of Mississippi (nor did any of it originate as waste outside of Mississippi).[8] The flow control ordinances would require that BFI and Waste Management dispose of waste they collect within the Region only at the Authority's landfill in Perry County.

After the filing of the complaint, the parties agreed that the enforcement of the ordinances would await the outcome of the case. In October 2002, the Mississippi State Attorney General intervened on behalf of Mississippi to defend a potential constitutional challenge to the Mississippi statute pursuant to which the

---

[7] Pine Belt Waste Systems, LLC, also joined with plaintiffs in bringing this suit. Pine Belt Waste, however, was voluntarily dismissed as a plaintiff on November 25, 2002, prior to trial.

[8] Although the Authority's landfill is the only Subtitle D landfill within the Region, *see supra* note 1, the landfills to which BFI and Waste Management currently haul garbage generated within the Region are Subtitle D landfills. BFI currently hauls waste collected within the Region to its landfill in Madison County, Mississippi, and Waste Management hauls its waste to a landfill owned and operated by an affiliated company in Scott County, Mississippi.

Authority was authorized to direct its Members to enact the flow control ordinances.  *See* MISS. CODE. ANN. § 17-17-319(2).

Trial was held in December 2002 before the district judge without a jury.  After the trial, but before a decision was rendered, Perry County filed a motion to dismiss for lack of jurisdiction based on the "adequate state grounds" doctrine.  Also following the trial, the district judge recused himself on his own motion, and the matter was subsequently properly assigned, with consent of the parties, to a magistrate judge for decision.  On April 23, 2003, the magistrate judge denied the motion to dismiss and issued findings of fact and conclusions of law and an accompanying judgment, deciding that the ordinances were unconstitutional under the dormant Commerce Clause and enjoining their enforcement.[9]  Defendants on May 22, 2003, timely filed their notice of appeal.

## Discussion

Defendants contend that the flow control ordinances do not violate the dormant Commerce Clause.[10]  We dismiss the dormant

---

[9] No damages were awarded.  While the judgment purports to generally award "attorneys fees," no amount thereof is stated in the judgment (or in the findings and conclusions) and we are informed by the parties that plaintiffs have in substance waived attorneys fees under this judgment by failing to file any evidence of the amount of attorneys fees or any motion in connection therewith as contemplated in FED. R. CIV. P. 54(d)92) and the local rules.

[10] Defendants also contend that the district court lacked jurisdiction because plaintiffs did not appeal the Member counties' and cities' adoption of the ordinances to a state circuit court as authorized by Miss. Code Ann.  11-51-75. *See Benedict v. City of Hattiesburg,* 693 So. 2d 377, 380 (Miss. 1997); *Falco Lime Inc. v. Mayor & Aldermen of City of Vicksburg*, 836 So. 2d 711, 716 (Miss. 2002).  We reject that contention.  The instant suit is one under 42 U.S.C. §

8

Commerce Clause claim in part for lack of standing and reverse with respect to the remainder of the claim.

### A.    *Standard of Review*

Review of questions of constitutional law is *de novo. United States v. Hemmingson*, 157 F.3d 347, 355 (5th Cir. 1998).  The magistrate judge's findings of fact, however, are reviewed for clear error.  *City of New Orleans v. Mun. Admin. Servs., Inc.*, 376 F.3d 501, 506 (5th Cir. 2004).

### B.    *Dormant Commerce Clause Analysis*

Although the Commerce Clause is an affirmative grant of power to Congress, U.S. CONST. art I, § 8, cl. 3, the Supreme Court has interpreted the clause to contain a negative aspect, the so-called "dormant" Commerce Clause.  *Dickerson v. Bailey*, 336 F.3d 388, 395 (5th Cir. 2003).  The dormant Commerce Clause "'prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'"  *Id.* (quoting *Wyoming v. Oklahoma*, 112 S.Ct. 789, 800 (1992)).

---

1983 seeking declaratory and injunctive relief against local government ordinances adopted under color of state law on the ground that the ordinances are invalid under and contrary to the United States Constitution.  *See Dennis v. Higgins*, 111 S.Ct. 865 (1991); *National Private Truck Council v. Oklahoma Tax Comm'n*, 115 S.Ct. 2351, 2353-54 (1995).  "When federal claims are premised on 42 U.S.C. § 1983 . . . we have not required exhaustion of state judicial or administrative remedies." *Steffel v. Thompson*, 94 S.Ct. 1209, 1222 (1974). *See also Self-Ins. Inst. of America, Inc. v. Korioth*, 993 F.2d 479, 482 (5th Cir. 1993).

We begin our dormant Commerce Clause analysis by asking whether the ordinances "(1) facially discriminate against out-of-state economic interests, or (2) regulate evenhandedly and thereby evince only an indirect burden on interstate commerce." *Dickerson*, 336 F.3d at 396. In other words, we ask whether the ordinances "reflect[] a discriminatory purpose or merely a discriminatory effect." *Id.* "Although . . . there is no clear line of separation between these two" classifications, "the threshold determination is significant if only because it establishes the constitutional standard of review." *Id.* (internal quotations and citations omitted).

Regarding the first category, "[s]tate laws discriminating against interstate commerce on their face are virtually *per se* invalid." *Id.* (internal quotations and citations omitted). The ordinance will be unconstitutional unless the state actor "can demonstrate, under rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* (internal quotations and citations omitted). "At a minimum such facial discrimination invokes the strictest scrutiny of any purported legitimate local purpose and of the absence of nondiscriminatory alternatives." *Hughes v. Oklahoma*, 99 S.Ct. 1727, 1737 (1979). "Under this strict scrutiny, . . . the state bears the heavy burden to rescue its statutes." *Dickerson*, 336 F.3d at 396 (internal quotations and citations omitted). "This burden is stringent" and the statute at

issue is "generally struck down . . . without further inquiry." *Id.* (internal quotations and citations omitted).

With the second category—the "evenhanded statutes" that effectuate a legitimate local interest and that only incidentally affect interstate commerce—we apply the "*Pike* balancing test." The statute will be upheld unless the burden it imposes on interstate commerce is "'clearly excessive in relation to the putative local benefits.'" *Id.* (quoting *Pike v. Bruce Church, Inc.*, 90 S.Ct. 844, 847 (1970)).

The magistrate judge struck down the flow control ordinances, finding them to be to be facially discriminatory against interstate commerce. The magistrate judge also determined that the ordinances would not pass the *Pike* test, assuming *arguendo*, as defendants argued, that the ordinances were not facially discriminatory.

### C. *Plaintiffs' Standing*

Before we consider the merits, we must first determine whether plaintiffs BFI and Waste Management have standing to challenge the flow control ordinances.[11] Although defendants have not explicitly raised the issue of standing, we may consider it *sua sponte*. *Bauer*

---

[11] As a not-for-profit trade association that represents the interests of the private waste services industry and of which BFI and Waste Management are members, plaintiff NSWMA's standing is on this record *entirely* dependent upon whether BFI and Waste Management having standing. *See Public Citizen, Inc. v. Bomer*, 274 F.3d 212, 219 n.5 (5th Cir. 2001) (stating that "organizational standing requires, . . . that individuals have standing to sue in their own right"). NSWMA took absolutely no active role in this litigation and has not submitted anything to establish its standing independent of that of BFI and Waste Management.

*v. Texas*, 341 F.3d 352, 357 (5th Cir. 2003). Our standing analysis consists of constitutional and prudential components.

### 1.    *Constitutional Standing*

"To meet the constitutional standing requirement, a plaintiff must show (1) an injury in fact (2) that is fairly traceable to the actions of the defendant and (3) that likely will be redressed by a favorable decision." *Procter & Gamble Co. v. Amway Corp.*, 242 F.3d 539, 560 (5th Cir. 2001) (citing *Bennett v. Spear*, 117 S.Ct. 1154, 1161 (1997); *Lujan v. Defenders of Wildlife*, 112 S.Ct. 2130, 2136 (1992)).

Plaintiffs meet the constitutional, or Article III, standing requirements. Because of the flow control ordinances, plaintiffs will not be able to ship the garbage they collect within the Region to the landfills of their choice and, as a result, will be forced to pay a "tipping"[12] fee at the Authority's landfill. Testimony at trial indicates that plaintiffs' cost to dispose of waste at the Authority's landfill, including the tipping fee and the transportation cost, would be higher than their current cost.[13]

---

[12] In garbage parlance, "tipping" is used in place of the less-refined "dumping."

[13] In addition to a simple comparison of current costs against the costs under the flow control ordinances, other testimony supports plaintiffs' claim of higher costs. The ordinances preclude plaintiffs from operating an "internalized" business—meaning that they collect, transport, and dispose of the waste using their own facilities. Testimony at trial suggests that such a method of operation achieves the best economy of scale for a waste collector. Further, BFI and Waste Management would face a reduced volume of waste at the transfer stations to which they currently haul waste from the Region, because they most likely cannot economically segregate at the transfer station the waste that comes from within the Region from that which comes from outside the Region. The result

Thus, plaintiffs have an injury (higher operating costs) that is traceable to the ordinances enacted by defendants and which would be remedied if we rule that the ordinances are unconstitutional.

### 2. *Prudential Standing*

The more difficult question is whether plaintiffs meet the prudential standing requirements. The goal of the prudential standing requirements is to "determine whether the plaintiff 'is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers.'" *Procter & Gamble*, 242 F.3d at 560 (quoting *Bender v. Williamsport Area Sch. Dist.*, 106 S.Ct. 1326, 1334 n.8 (1986)).

> "These judicially created limits concern whether a plaintiff's grievance arguably falls within the zone of interests protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties." *Procter & Gamble*, 242 F.3d at 560.

The key inquiry for prudential standing in this case is whether the injury of which plaintiffs complain is "arguably within the zone of interests to be protected" by the dormant Commerce Clause, the "constitutional guarantee in question" here. *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 90 S.Ct. 827, 830 (1970). *See also Boston Stock Exch. v. State Tax Comm'n*, 97 S.Ct.

---

of the reduced volume at the transfer stations would be an increased operating cost per ton.

13

599, 603 n.3 (1977) (applying the zone of interests test in the context of the dormant Commerce Clause). The facts of this case require that we analyze the zone of interest question in two parts: We must determine whether plaintiffs have standing to challenge the flow control ordinances as being facially discriminatory against out-of-state economic interests or whether they can merely challenge the ordinances as being excessively burdensome to interstate commerce.

### a. *Facially Discriminatory*

The two-staged analysis for dormant Commerce Clause claims is instructive as to the relevant zone of interests to be protected. First, with respect to laws that facially discriminate against out-of-state economic interests, the dormant Commerce Clauses seeks to protect against local economic protectionism and retaliation among the states. C & A Carbone, Inc. v. Town of Clarkstown, N.Y., 114 S.Ct. 1677, 1682 (1994) ("The central rationale for the rule against discrimination is to prohibit state or municipal laws whose object is local economic protectionism, laws that would excite those jealousies and retaliatory measures the Constitution was designed to prevent."). In this context, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon*

*Waste Sys., Inc. v. Dep't of Envtl. Quality of the State of Or.*, 114 S.Ct. 1345, 1350 (1994).

We conclude that plaintiffs' injury does not fall within the zone of interests to be protected by the dormant Commerce Clause with respect to ordinances that are alleged to facially discriminate against out-of-state economic interests. The flow control ordinances mandate that any waste generated within the Region be transported to the Authority's landfill or transfer stations. In effect, the ordinances prohibit the export of any waste outside of the Region, including out of state. However, *these* plaintiffs do not ship (and, so far as the record shows, have never shipped) *any* waste they collect within the Region to any location outside of Mississippi, nor do they ship (and, so far as the record shows, have never shipped) any waste from outside of Mississippi to the Region. Plaintiffs also have not even alleged that they have any plans to do so,[14] and have not suggested that some other party currently ships waste from the Region outside of Mississippi, or has plans to do so, or that any out-of-state waste processor receives (or has plans to receive) any of the Region's waste out of state. In sum, plaintiffs' injury is not related to

_____

[14] Stone County, a Mississippi county that is now within the Authority's expanded service area, *see supra* note 4, has voted to join the Authority, and the Authority has agreed in principle; however, the required ultimate contract between the two had not been finalized by the time of the trial. Waste collected in Stone County by BFI is currently shipped to a landfill in Alabama. As Stone County has not enacted any flow control ordinance and is not a party to this suit (and as none of the here challenged ordinances is applicable to waste collected in Stone County), we will not consider the fact that waste from Stone County is actually shipped out of state.

any out-of-state characteristic of their business.[15]   Thus,

plaintiffs do not have standing to challenge the ordinances on the

basis of a claim that they are facially discriminatory against out-

of-state interests.[16]   As such, we express no opinion about whether

the ordinances would pass the facially discriminatory test if

challenged by a proper plaintiff.

_____

[15]   We also observe that both BFI and Waste Management have their principal place of business in Mississippi.  Nothing in the flow control ordinances turns on the principal place of business or the place of incorporation or the citizenship of any generator, disposer or handler of waste (or otherwise).

[16] We note that our conclusion that plaintiffs do not meet the prudential standing requirement differs from that in two opinions from our sister circuits. *See On the Green Apartments LLC v. City of Tacoma*, 241 F.3d 1235 (9th Cir. 2001); *Houlton Citizens' Coalition v. Town of Houlton*, 175 F.3d 178 (1st Cir. 1999). In *On the Green* and *Houlton*, the plaintiffs did not allege that they disposed of their waste out of state or that they had plans to do so.  *On the Green*, 241 F.3d at 1241–40; *Houlton*, 175 F.3d at 183.  Nevertheless, both the Ninth Circuit and the First Circuit concluded that the plaintiffs met the prudential standing requirements.
      We disagree with the analysis in this aspect of *On the Green* and *Houlton*. In *On the Green*, the Ninth Circuit concluded that because the plaintiff alleged only an *intrastate* burden, the "Commerce Clause [was] not at all implicated." *On the Green*, 241 F.3d at 1242.  We fail to see how the plaintiff's alleged injury could even arguably fall within the zone of interests to be protected by the dormant Commerce Clause when the court concluded that the case *did not even implicate the Commerce Clause*.  *See id.* at 1242 (Reavley, J., dissenting). Further, the Ninth Circuit seems to have confused the redressability requirement for constitutional standing with the zone of interests test.  The Ninth Circuit concluded that the plaintiff's injury was "related to the purposes underlying the Commerce Clause" because the "injury would be *remedied* if [the plaintiff] could take its garbage outside the city." *Id.* at 1241 (emphasis added).  The fact that an injury would be remedied if the ordinance was struck down does not mean that the grievance falls within the zone of interests to be protected by the dormant Commerce Clause, particularly when there was no allegation of *any interstate* burden.   Under the Ninth Circuit's rationale in *On the Green*, the zone of interest test and the redressability requirement would essentially be the same.
      In *Houlton*, the First Circuit concluded that the plaintiff met the zone of interests requirement because the plaintiff had "assert[ed] his own economic interests under the Commerce Clause—a constitutional provision specifically targeted to project those interests." *Houlton*, 175 F.3d at 183.  However, the rationale behind the dormant Commerce Clause is to protect against *local economic protectionism at the expense of out-of-state interests*, *Carbone*, 114 S.Ct. at 1682, not to protect *any economic* interests.  In our opinion, the *Houlton* court simply viewed too broadly the zone of interests protected by the dormant Commerce Clause.

16

### b.    *Burdens Interstate Commerce*

We next consider whether plaintiffs nonetheless have standing to challenge the flow control ordinances on the basis of the claim that they excessively burden interstate commerce.  We conclude that plaintiffs do meet the zone of interests test in this regard and thus have standing to challenge the ordinances as to their burden on interstate commerce.

The protected against injury is an excessive burden on interstate commerce.  An allegation that the plaintiff is involved in interstate commerce and that the *plaintiff's* interstate commerce is burdened by the ordinance in question is sufficient to satisfy the zone of interests test with respect to ordinances that assertedly impose an excessive burden on interstate commerce.

Even though plaintiffs do not ship any garbage collected in the Region out of state, they are engaged in interstate commerce, and *their* interstate commerce is allegedly burdened by the ordinances.  A representative of BFI testified at trial that BFI had some contracts that are negotiated on a national or an interstate basis and that such contracts were common.  The BFI representative testified that an effect on the Mississippi portion of such a contract would ripple to the portion of the contract in other states.[17]  Plaintiffs argue that, because the flow control

---

[17]    It is not claimed that anything in the contracts requires that any waste collected within the Region be disposed of outside of the Region.  Nor do the ordinances make any requirement that any waste collected outside the Region (though under a contract also covering waste collected within the Region) be

ordinances will raise their costs to service these national and regional contracts which include customer locations within the Region, they will be relatively less competitive within the Region and that this impact on these contracts will extend to the portion of the contracts covering customer locations outside of Mississippi. The ordinances thus allegedly burden plaintiffs' interstate commerce. Plaintiffs therefore are arguably within the appropriate zone of interests and, therefore, have standing to challenge whether the ordinances excessively burden interstate commerce.[18]

### D. Pike *Balancing Test*

We now turn to the *Pike* balancing test to determine whether the flow control ordinances excessively burden interstate commerce.[19] For this analysis, because plaintiffs do not have standing to challenge the ordinances as facially discriminatory

---

disposed of within the Region.

[18] A Waste Management representative gave testimony similar to that given by the BFI representative. He testified that the parent company, Waste Management, Inc., operated in 48 states and that because of the interrelated nature of the business, savings achieved on a transaction in one state would eventually be shared in another stated. Although the representative did not testify that increased *costs* in one area would be similarly shared, we assume arguendo that they would be.

In any event, when one of multiple co-parties raising the same claims and issues properly has standing, we do not need to verify the independent standing of the other co-plaintiffs. *See Clinton v. City of New York*, 118 S.Ct. 2091, 2100 n.19 (1998); *Bowsher v. Synar*, 106 S.Ct. 3181, 3185 (1986). Therefore, because we find that BFI has standing to challenge whether the flow control ordinances excessively burden interstate commerce, we need not further analyze Waste Management's independent standing.

[19] Because the magistrate judge alternatively held that the ordinances would not pass even the less rigorous *Pike* test, we need not remand the case for the court below to consider the *Pike* test in the first instance.

18

against out-of-state interests, we ignore the fact that the ordinances would not permit them to ship waste generated within the Region out of state.

An "evenhanded" ordinance, *i.e.*, one that does not facially discriminate against out-of-state interests and only incidentally affects interstate commerce, will be upheld unless the burden it imposes on interstate commerce is "clearly excessive in relation to the putative local benefits" of the ordinance. *Pike*, 90 S.Ct. at 847. To make this assessment, we consider the nature of the local interest and whether alternative means could achieve that interest with less impact on interstate commerce:

> "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Id.*

We first look for a legitimate public purpose that defendants intended to advance by implementing flow control. Defendants indeed have a legitimate local purpose: to ensure the economic viability of their landfill. *See U & I Sanitation v. City of Columbus*, 205 F.3d 1063, 1070 (8th Cir. 2000) (recognizing economic viability as a legitimate local purpose in the context of a waste flow control ordinance).

Next, we identify the burden imposed on interstate commerce. To succeed in a challenge to a regulation under the *Pike* balancing test, the challenging party must show that the regulation has "a

19

disparate impact on interstate commerce." *Automated Salvage Transp., Inc. v. Wheelabrator Envtl. Sys., Inc.*, 155 F.3d 59, 75 (2d Cir. 1998). The "incidental burdens to which *Pike* refers are the burdens on interstate commerce that exceed the burdens on intrastate commerce." *Id.* (internal quotation and citation omitted). "Where a regulation does not have this disparate impact on interstate commerce, then we must conclude that . . . [it] has not imposed any incidental burdens on interstate commerce" and, therefore, that it passes the *Pike* test. *Id.* (internal quotation and citation omitted).

The flow control ordinances here do not have a disparate impact on interstate commerce; consequently, plaintiffs fail in their attempt to show that the ordinances do not pass the *Pike* test. The only evidence of an interstate burden is the effect on plaintiffs' interstate contracts: the flow control ordinances, because they will raise plaintiffs' costs within the Region and will make plaintiffs relatively less competitive, impose a burden on plaintiffs' interstate commerce by affecting the portion of plaintiffs' interstate contracts that involve areas beyond Mississippi. The burdens imposed by the ordinances on interstate commerce, however, are no greater than those imposed on *intrastate* commerce. Plaintiffs' contracts that are wholly within Mississippi, and even wholly within the Region itself, will also be affected as plaintiffs' costs increase within the Region and

20

plaintiffs, thereby, become relatively less competitive. In fact, the burden imposed on wholly intrastate contracts, particularly those that are contained wholly within the Region, will likely be *greater* than that imposed by the flow control ordinances on plaintiffs' interstate contracts. The interstate contracts—which are presumably larger than plaintiffs' contracts that are contained entirely within Mississippi or the Region—will likely be more able to spread the increased costs over a wider base of business than will plaintiffs' smaller contracts. We fail to see how the ordinances will in this respect impose a greater burden on interstate commerce than they will on *intrastate* commerce.

Moreover, so far as they affect BFI and Waste Management, the ordinances do not inhibit the flow of goods (or waste) interstate. *Int'l Truck & Engine Corp. v. Bray*, 372 F.3d 717, 727 (5th Cir. 2004) ("A statute imposes a burden when it inhibits the flow of goods interstate."). Furthermore, while the ordinances may have the effect of shifting some business away from plaintiffs, as the ordinances increase their costs and make them relatively less competitive, this result does not mean that the ordinances burden interstate commerce: "[T]he dormant Commerce Clause 'protects the interstate market, not particular interstate firms.'" *Id.* (quoting *Exxon Corp. v. Governor of Md.*, 98 S.Ct. 2207, 2215 (1978)) (stating that the fact that a regulation might cause truck purchasers to turn to other competing truck manufacturers did not

21

burden interstate commerce). If plaintiffs lose some of their interstate contracts because of their higher costs within the Region, the ordinances would not prohibit another garbage collector from entering into a similar interstate contract, whether that garbage collector was from Mississippi or some other state.

Because plaintiffs have not shown that the ordinances disparately impact interstate commerce relative to intrastate commerce, their *Pike* challenge that the ordinances excessively burden interstate commerce fails.

## Conclusion

Accordingly, (a) we DISMISS for want of standing plaintiffs' claim with respect to whether the ordinances facially discriminate against interstate commerce or out-of-state interests, and (b) with respect to whether the ordinances otherwise excessively burden interstate commerce, we REVERSE and RENDER judgment for defendants.[20]

---

[20] In his opinion the magistrate judge did not reach any conclusion regarding MISSISSIPPI CODE § 17-17-319(2), the law pursuant to which the Authority directed its Members to enact flow control ordinances, the judgment does not speak to § 17-17-319(2) and the parties do not argue that this court need address its constitutionality. Moreover, as we hold that as to the particular flow control ordinances here the suit must be dismissed for want of standing with respect to whether the ordinances are facially discriminatory against interstate commerce contrary to the dormant Commerce Clause and that those ordinances do not violate the dormant Commerce Clause with respect to whether they otherwise excessively burden interstate commerce compared to their putative local benefits, we need not further address the constitutionality of § 17-17-319.

22